IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>          v.<br><br>EMILIO RAMON PAY-PAY,<br><br>                    Appellant. | No. 86283-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Emilio Ramon Pay-Pay challenges his conviction for murder in the first degree on several grounds. First, he challenges the State's exercise of a peremptory challenge against a juror of color under GR 37. He challenges the admission of various pieces of evidence and asserts prosecutorial misconduct. Further, Pay-Pay challenges his sentence on various grounds, including that the court prevented him from presenting critical mitigation evidence regarding his youthfulness, failed to meaningfully consider his youth, and deprived him of due process by improperly relying on unproven facts and demonstrating judicial bias. He challenges his offender score because it was calculated with his juvenile adjudications and because a jury did not make the factual determination that his juvenile adjudications constituted the "same course of conduct." Finally, Pay-Pay asks to strike the "Victim Penalty Assessment" (VPA). We remand to strike the VPA but otherwise affirm.

BACKGROUND

At 8:39 p.m. on December 29, 2019, 20-year-old James Richardson was driving southbound on State Route (SR) 509 in south Seattle when he was shot in the left side of the head and crashed against the "jersey barrier." Although passing motorists stopped to help, none of them witnessed the shooting. Shortly after arriving at the hospital, Richardson died from his injuries.

Surveillance video from "Demolition Man," a business located next to SR 509, captured a portion of the shooting. The video shows a vehicle driving south just beyond the First Avenue Bridge. This vehicle was later determined to be the grey Dodge Challenger that Richardson was driving. A second vehicle without its headlights on can be seen passing the Challenger on its left. Multiple gunshots can be heard as the second vehicle passes the Challenger. The video quality was not sufficient to determine the make and model of the second vehicle. At trial, the State argued that Pay-Pay was driving the second vehicle, a silver Chevy Impala, with two passengers, Ali Sharif and Aden Mohamed, and that they were following Richardson.

Corey Batiste, who was in the front passenger seat of the Challenger at the time of the shooting, was interviewed by police at the scene of the crime, but later died before the trial.[1] Accordingly, at the trial, there were no witnesses to the shooting.

Richardson was an emerging rap artist who used the moniker "Tanaa Money." His music group was called the "Grimey Gangster Guerrillas" or "GGG." The summer before Richardson was killed, he recorded and posted a music video on YouTube that featured a park in the Holly Park neighborhood, located "northwest of . . . the Rainier

---

[1] No evidence was presented about the circumstances of Batiste's death. However, the State's motion to admit ER 404(b) gang evidence states, without citation, that "Batiste died in Louisiana in 2021."

Valley . . . district and South Seattle." There is a group affiliated with the Holly Park neighborhood that demonstrates their affiliation with a hand sign resembling an "H." The numbers 37, 39, 3700 or 3900 are also associated with the Holly Park group, as they reflect some of the primary block ranges in the neighborhood.

At trial, the State argued that Pay-Pay, Sharif, and Mohamed were closely associated with each other and the Holly Park neighborhood group. The State theorized that Richardson's murder had been orchestrated by that group. To show this, the State presented social media posts on Snapchat[2] associated with Pay-Pay, Sharif, and Mohamed. These posts indicated the three "were clearly friends and closely connected." Snapchat posts also showed that Pay-Pay, Sharif, and Mohamed were connected with others in the Holly Park neighborhood.

Posts that were saved to Pay-Pay's Snapchat account before Richardson's murder indicated animosity toward GGG. For example, a photo saved on December 2, 2019, depicted Pay-Pay making a GGG hand sign with one hand and giving that sign the middle finger with his other hand. Another video saved to Pay-Pay's account on December 12, 2019, showed an overlay of the text "GGGK bitch" and crying-face emojis. Pay-Pay can be heard on the video stating "GGGK bitch." The "K" signifies "killer."

Other posts related to Richardson and GGG were saved to Pay-Pay's and Mohamed's Snapchat accounts. For example, a video saved to Mohamed's account on

---

[2] Snapchat is a visual messaging app that people use as an alternative to texting. The app revolves around "taking snaps, which [can be] a picture, a video, a message, text message, or an audio or visual call." The app deletes these communications within 24 hours of all parties viewing the message. However, users can save messages to Snapchat's cloud storage service. Snapchat maintains some user data such as basic subscriber information, saved content, metadata of activity when a user utilizes the app, and geolocation information. The geolocation data shows where a user was located when accessing the app.

December 31, 2019, showed Mohamed listening to one of Richardson's songs, overlaid with a "sadface" or "frowning face" emoji and the phrase "Winter fails." A photo saved to Pay-Pay's account on January 1, 2020, depicted Mohamed displaying the GGG hand sign with one hand and giving that sign a middle finger with his other hand. Similarly, a photo saved to Mohamed's account on January 1, 2020, showed Mohamed pointing a firearm at a GGG hand sign. The State also presented a screenshot of a social media post from an Instagram account named "TanaamoneykillerGGGK" that was saved to a group chat that included Pay-Pay. The post displayed a grid of nine photos, all of whom were confirmed GGG members. Richardson's photo was in the middle, and the text "wasted" was placed over his face. The caption below the photo read "8 more n[-words] to go."

Location data for Richardson's cell phone indicated that prior to his murder, he had bought food from the fast-food restaurant Jack in the Box and dropped it off for his girlfriend, who was working at Kittens Cabaret in the Georgetown neighborhood. To determine the timeline of events, investigators obtained surveillance videos from ten businesses in Georgetown along the route Richardson took.

The State based its timeline on the surveillance videos, cell phone tower data, and geolocation data extracted from social media posts. The State explained to the jury that first, Pay-Pay[3] was in Lakewood around 6:30 p.m., then travelled to Holly Park, where Sharif was located. Around 7:30 p.m., Pay-Pay called a Lao restaurant located on Martin Luther King Way South. Sharif then travelled from Holly Park to that restaurant, where he stayed from 7:35 p.m. until 7:59 p.m. At 8 p.m., Sharif was tracked

---

[3] Investigators were unable to obtain geolocation data from Pay-Pay's Snapchat account. Rather, this data was based on cell phone tower data.

travelling south from the Lao restaurant to Georgetown. Surveillance footage captured a silver vehicle travelling the same route to First Avenue South in Georgetown at the same time as Sharif. The State asserted this silver vehicle was Pay-Pay's Impala and explained to the jury that "the overwhelmingly obvious inference" was that "Paypay picked up [ ] Sharif in Holly Park and they went out to dinner." Meanwhile, around 8:19 p.m., Mohamed was with other Holly Park group members in a blue Toyota Corolla in the Georgetown area.

At 8:25 p.m., Richardson arrived at the drive-thru of the Jack in the Box on First Avenue South. The blue Corolla carrying Mohamed parked at a Chevron gas station nearby. At 8:30 p.m., while Richardson remained in the Jack in the Box drive-thru, the blue Corolla and the silver Impala both pulled into the Jack in the Box parking lot next to each other. The blue Corolla remained in the parking lot only briefly until it returned to the Chevron next door.

At 8:32 p.m., Richardson left the Jack in the Box drive-thru and drove north on First Avenue, toward Kittens Cabaret. The silver Impala exited the Jack in the Box parking lot shortly after Richardson and also turned north on First Avenue. At 8:34 p.m., Richardson pulled into the Kittens parking lot and dropped off the food for his girlfriend. Meanwhile, the silver Impala parked behind a nearby dumpster.

At 8:36 p.m., Richardson left the Kittens parking lot and drove south on Fourth Avenue South, then turned right on Michigan Street and continued onto the First Avenue Bridge. The silver Impala drove in the same direction, down Fourth Avenue South, right on Michigan Street and onto the First Avenue Bridge. Around 8:39 p.m.,

5

after crossing over the First Avenue Bridge towards SR 509, Richardson was shot and killed.

By 8:58 p.m., cell phone tower data showed that Sharif and Mohamed were traveling south together toward Lakewood. At 9:36 p.m., Pay-Pay, Sharif, and Mohamed were seen on surveillance video at Classy Chassis, a carwash in Lakewood. On the video, the license plate on Pay-Pay's silver Impala was visible as he washed his car. Afterwards, geolocation data associated with Sharif's and Mohamed's Snapchat accounts as well as a video posted to Snapchat by Pay-Pay indicated that the three of them returned to Pay-Pay's home in Lakewood, where they posted videos on social media related to the Holly Park group.

The State's theory at trial was that other Holly Park members spotted Richardson in Georgetown. According to the State, while Richardson was in the Jack in the Box drive-thru, the blue Corolla and silver Impala parked nearby. Mohamed exited the blue Corolla and joined Pay-Pay and Sharif in the Impala. Once Pay-Pay, Sharif, and Mohamed were together, surveillance footage indicated they followed Richardson onto SR 509 until they sped past him, then shot and killed him.

The police arrested and interviewed Pay-Pay in May 2020. During his interview, he told detectives that he had sold his silver Impala on either December 25 or 26, 2019, and had not had it, seen it, or driven it since. However, investigators retrieved a video saved to Pay-Pay's Snapchat account on January 11, 2020, showing him saying "good-bye" to his Impala. Department of Licensing records indicated that Pay-Pay filed a report of sale on January 11, 2020, with the sale date listed as December 26, 2019.

The State charged Pay-Pay with one count of murder in the first degree while armed with a firearm for Richardson's death. When the trial commenced, the parties initially selected a jury, but due to defense counsel's health issues, that jury was dismissed. The parties selected a second jury two weeks later. During the second jury selection, the State used one of its peremptory strikes to successfully strike a juror of color.

Witness testimony began April 10, 2023. The jury convicted Pay-Pay as charged on May 5, 2023. That same day, the court scheduled the sentencing hearing for June 9, 2023, without objection. On May 31, 2023, Pay-Pay moved to continue the sentencing hearing so he could secure an expert to create a presentencing report related to his youthfulness as mitigating evidence. The court denied the motion. At sentencing, Pay-Pay did not dispute his "offender score or the scoring." The trial court imposed a sentence of 360 months, near the low end of the standard range. Pay-Pay timely appeals.[4]

## DISCUSSION

Pay-Pay challenges his conviction and sentence on several grounds. First, he contends the trial court incorrectly permitted the State to use its peremptory strike against a juror of color, in contravention of GR 37. Second, he argues the trial court erred when it admitted evidence under ER 404(b), including evidence of his affiliation with the Holly Park neighborhood, his codefendants' access to weapons that could have been used in Richardson's murder, and a "Bingo Card" showing Richardson's face with the word "wasted" over it. He also argues the trial court improperly exercised its

---

[4] Both parties submitted statements of additional authorities and responses thereto.

7

discretion when it admitted three different sets of surveillance videos from the Georgetown area without proper authentication under ER 901(a). He further argues the prosecutor engaged in misconduct during argument.

Pay-Pay also asserts several errors related to his sentencing. Pay-Pay contends that the trial court erred when it denied his request to continue the hearing to pursue a neuropsychological evaluation and that it did not meaningfully consider his youth at sentencing. He also argues he was deprived of his right to an impartial tribunal and that the court impermissibly relied on unproven facts during sentencing. Further, he argues his offender score was incorrectly calculated because it relied on juvenile adjudications and because a jury was required to find beyond a reasonable doubt whether his juvenile adjudications constituted the "same course of conduct." He also challenges the imposition of the VPA. We address each issue in turn.

## I. GR 37

Pay-Pay argues that the trial court "violated GR 37 when it allowed the State to exercise a peremptory challenge against a juror of color because it was not 'based' on race." We disagree.

"Our constitutions require a fair and impartial jury." State v. Tesfasilasye, 200 Wn.2d 345, 356, 518 P.3d 193 (2022) (citing U.S. CONST. amend. VI; WASH. CONST. art. I, § 22). Tradition, statutes, and court rules developed peremptory strikes to "strike a limited number of otherwise qualified jurors from the venire without providing a reason." Tesfasilasye, 200 Wn.2d at 356. GR 37 was developed to "eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). "In addition to preventing purposeful racial discrimination, the rule is aimed at preventing implicit racial

and ethnic biases in jury selection, which are subconscious attitudes towards groups that influence a person's decisions without their awareness." State v. Bell, 5 Wn.3d 54, 66, 571 P.3d 272 (2025). "The court rule establishes considerations to guide courts and parties any time race or ethnicity is implicated in the use of a peremptory challenge, which better ensures the fairness in the jury selection process." Id.

First, "when a party objects to the opposing party's use of a peremptory challenge, the court must discuss the objection outside of the jurors' presence. GR 37(c). The other party exercising the peremptory challenge must explain its justification. GR 37(d)." Id. Then, under GR 37(e), "the court must evaluate the reason given to justify the peremptory challenge in light of the totality of circumstances and determine if an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." Id. at 66-67. An objective observer is one who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

GR 37 enumerates five factors that courts "should consider" when evaluating the reason given for the peremptory challenge, including (i) "the number and types of questions posed to the prospective juror"; (ii) whether the challenging party "asked significantly more questions or different questions of the potential juror"; (iii) whether other jurors "provided similar answers but were not the subject of a . . . challenge"; (iv) "whether a reason might be disproportionately associated with a race or ethnicity"; and (v) "whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases." GR 37(g)(i-v). This list is not exhaustive. GR 37(g). GR 37 also classifies certain challenges as "presumptively

9

invalid" due to their historical association with juror discrimination, including "expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling." GR 37(h)(ii).

In this case, at the beginning of voir dire,[5] the trial court identified 31 prospective jurors as being people of color.[6] Juror 32 was one of 14 prospective jurors who identified as Asian. During voir dire, defense counsel asked the panel if anyone had anything come up regarding the prior questions asked, other prospective jurors' answers, the nature of the case, or anything else. Juror 32 raised their[7] hand and stated:

> Just a couple things to answer the earlier question about what came up for me in the lunch period and along the notes of being complicit in the systems. I've heard the Judge say earlier too that the obligation and you've got to, the two things, and just wondering what are the repercussions for not serving on the jury or -- there were just a lot of feelings.

In response, the court clarified that "[t]here are consequences, but I don't want to visit them on anybody here because I don't see any reason to right now, okay?" Juror 32 indicated they understood and continued, "And yeah, sitting with that, the complicity of being part of militaristic, imperialistic system, violent, and just grappling with those feelings during lunch."

Defense counsel did not follow up with juror 32 concerning those comments, but the State did, as follows:

> Juror 32, I'm going to come to you now. So earlier today you had some comments about the criminal justice system, and you used some pretty

---

[5] Unless otherwise indicated, all references are to the second voir dire that resulted in the jury that was seated for Pay-Pay's trial and convicted him.

[6] Of these, five jurors of color were selected to serve on the jury, jurors 19, 21, 38, 45, and 96. The State used a peremptory strike to remove juror 32.

[7] Juror 32 identified as non-binary.

strong language, and I don't want to misspeak, so correct me if I'm wrong. I think you characterized the system as militaristic and imperialistic. Did I get that right?

Juror 32 responded, "Yeah, in reference to what I heard earlier before the lunch break about the nation's founding and the -- I can't remember the word, but just in selecting a jury and like hearing cases." When the State asked them what their impressions of the case were, they responded, "[T]his dialoguing, I was not expecting that. I was expecting more of a one-way kind of paternalistic, very, yeah, you know, strict, I've heard someone say too. So this two-way kind of this collective dialoguing is unique and . . . contrary to what I was assuming." Juror 32 also clarified the reasons for their previous questions:

> I was trying to ask my question about how are we defining wrong. If me, I hear it and I think, oh, breaking the law, that's what we mean by wrong. And then the question, yeah, about -- I heard again the judge saying before the lunch break that we've got to do two things, serving . . . and then two, jury duty. I was wondering what the implications are if you don't, right? If you get drafted and you don't serve or if you don't serve when you're being called to serve on the jury.

The State then asked how juror 32 saw themself as a juror in the case. They responded, "If selected, I mean, yeah, biased and I'd be really -- I would have to really practice that open mind. Yeah." The State asked what juror 32 had a closed mind about and what were things they had been practicing. Juror 32 specified,

> Personally, I'm in a place in my life where I'm practicing a white embargo. So kind of staying away or choosing to not listen to music by white artists, not frequenting businesses that are not black-owned, or just owned by people of color. Just trying to basically distance myself from whiteness and trying to examine how that has permeated my personal beliefs, preferences and how -- just, it's everywhere. So I think that, for one, would be challenging for me.

11

Separately, when asked by defense counsel why they would be a good juror, juror 32 mentioned they "love asking questions for clarity, I think I'm a good listener, and I think I am really good at being heady or in thoughts and not a very emotional person. I think I struggle with feelings sometimes."

Juror 32 also answered on their questionnaire that either they, a friend, or a family member had been a victim of a violent crime. Noting that juror 32 indicated a preference for a "one on one" interaction to discuss this answer, the trial court stated that it "wanted to ask [them] about [their] ability to serve." The following exchange took place:

> The Court: I know how strongly you feel about being a person of color. I respect the white boycott you're engaging in. I don't think other jurors understand that necessarily. It always feels like a boycott of anything based on race is racist, but not always, is my view.
>
> But having said that, I do want to make sure that you can do the job here, okay? You have strong views, which I really respect. Tell me about your thinking about your ability to be a juror in this case.
>
> Prospective Juror [32]: I think, yeah, I think throughout the whole day, listening and asking again, I think it'd be helpful for me once -- if there was something written to maintain and to remember what was all said and what's expected of a juror. I think that would help me process and just remember the responsibilities. Like I said, I've never done this before.
>
> The Court: I know.
>
> Prospective Juror [32]: Yeah. And it is a serious job, a task, duty, and serious allegations and a serious matter. So I think I can do the job. I can do what's asked of me, and needing the clear expectations and duties and responsibilities and those reminders would be helpful.
>
> The Court: If the State proves its case beyond a reasonable doubt, and I don't know if they can do that or not, and if they overcome the presumption of innocence, can you convict with the strong feelings you have about the legal system and especially about the criminal justice system if they prove their case beyond a reasonable doubt?

Prospective Juror [32]: And with the reminders and what's tasked -- what's expected of me and given the facts, what's what I hear and see in the process, I think so, yes.

The State exercised its second peremptory challenge against juror 32.

Immediately, the court requested that the State address GR 37. The State provided the following reasons for its challenge:

First, juror 32 expressed that they were worried about being complicit in a system that they felt was militaristic, imperialistic, and violent. Those were the words that the juror used to describe our system of justice. And the juror was expressing that they were trying to grapple with those feelings during this process.

While the juror expressed that they were surprised to see the dialogue that we engaged in during voir dire rather than the strict paternalistic process that they had expected, the State's concern is what appears not to be just a distrust of the system, but instead actual opposition to it. And in fact, when juror 32 actually asked Your Honor what the repercussions would be for not serving, as in what sanctions and what punishment could be imposed should this juror decline to serve, this demonstrated to the State that the juror was actually worried about participating and being complicit in the system such that refusing to serve was something that the juror had at least contemplated at some point. And when asked how juror 32 saw themselves as a juror, juror 32 was very honest and expressed a concern about bias and how they would, quote, really have to practice the open mind. When asked what juror 32 had a closed mind about juror 32 express[ed] that they had self-imposed a white embargo and were therefore not listening to music by white artists, not frequenting white businesses and distancing themselves from whiteness. And it has, in effect, according to this juror, permeated their beliefs and preferences.

Juror 32 then expressed that they would need -- in this context, juror 32 then expressed that they would need something written down and presented throughout each day of trial in order to maintain and remember what was said by this Court and expected of the juror's impartiality. It was extraordinarily concerning to the State that the juror expressed such a great concern about the ability to set aside bias such that the juror would need something to refer to in writing throughout the day in order to maintain a fairness and impartiality.

The juror also expressed when this Court asked if the state had met its burden if the juror could convict and the juror said, "I think so," but then conditioned it premised on receiving those daily and continuous reminders

13

of fairness and impartiality. This juror's inability to have more certainty, the juror's self-described what we perceived as a hostility to the system of justice, the juror's admitted bias and the juror's expressed belief that they could only set aside that bias with what is essentially would be a great deal of effort and constant and daily written reminders about the need to set aside that bias in order to fairly evaluate this case, those are the reasons that the State is exercising the peremptory.

Defense counsel argued that while juror 32 was perhaps "more passionate" than other jurors, "they indicated that they could and would follow the law." Defense counsel also mentioned that "the concerns that they voiced are quite frankly concerns that we all share. Perhaps not the vocabulary, but the sentiment behind it was not such that the defense feels the State would be prejudiced by keeping this juror."

After hearing from both parties, the trial court stated the following before granting the challenge:

> So I'm really respectful, but I also have to say that juror 32 was specifically asked, I asked, "Have you experienced something personally?" Because that's such an important part of the GR 37 inquiry, and juror 32 said, no. This is an intellectual position for juror 32. It's not a response like it is, for example, for many black jurors that I've talked to being handled unfairly out in the world.
>
> We've talked about that on the record here because [defense counsel] and I have exchanged stories about what he's experienced and what almost every friend of color I have has experienced, but juror 32 hasn't. This is an intellectual position for 32. So I really think what's going on with 32, and I think the State has said it well, but I'm going to state it in a more summary way, is that 32 has aligned themselves in opposition to the legal system and the principles that we have. I don't know what they want instead of our system, and I don't think they know exactly either, but they would feel complicit is what they articulated in a system they profoundly disagree with.
>
> I think juror 32 would be extremely challenged in applying the law in this case. If juror 32 was convinced beyond a reasonable doubt that the State proved its case, I think juror 32 would struggle mightily with applying the law. And I have to tell you, when I run into jurors, even when I really respect them, and I do in this case, who are unable to follow their duty to carry out the law, I have to grant a peremptory challenge.

14

I really was inquiring closely of 32 because 32 said so many things that almost amounted to a challenge for cause. 32 veered away, but 32 also veered away by sometimes not answering, okay, when asked questions about their ability to be a juror here. I mean, I think this is a well-founded peremptory and I don't think it's based on juror 32's Asian background, nor do I think it's based on juror 32's identification as [non-]binary. So I'm granting the challenge.

Our review of an alleged GR 37 violation is de novo. <u>Bell</u>, 5 Wn.3d at 66. Thus, under GR 37(e), we must "evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances" and "determine if an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge."

The first GR 37 consideration is "the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it." GR 37(g)(i). The State asked juror 32 five questions. It first asked about the "strong language" juror 32 had used to describe the system, referencing their description of the system being "militaristic," "imperialistic," and "violent." In its following questions, it asked juror 32 their impressions of jury selection thus far, their obligations if they were called for jury duty, how they see themselves as a juror, and what they had a "closed mind" about after they discussed their possible bias.

Second, courts should consider "whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors." GR 37(g)(ii). Here, when other jurors raised concerns about implicit bias, the State asked

15

over eight questions to juror 8 and five questions to juror 5. The State also asked jurors

9 and 24 four questions each. Thus, the record shows that the State asked juror 32 a

similar number of questions as it did to other jurors.

As to the nature of the questions, the State showed a common theme in its

questioning. For example, the State consistently based its questioning on the jurors'

answers from the questionnaires.[8] Based on that approach, each set of questions was

somewhat unique to each juror, and, thus, juror 32 was explicitly asked about their prior

comments concerning the criminal justice system, as were others who raised similar

concerns. Otherwise, the State asked juror 32 similar questions as it did to other jurors,

such as their impressions of the jury selection process thus far and how they see

themselves as a juror. Additionally, the State asked juror 5 about their opinion of the

court system and asked juror 8 about their ability to serve as a juror.

However, as for the State's stated concern about juror 32's distrust in the criminal

justice system and their ability to serve as a juror, the record shows that the State's

questioning of other jurors on these same topics was different. For example, juror 105,

who did not identify as a juror of color, agreed with other jurors that "the [criminal justice]

system [is] designed to lock people up" and "that U.S. incarceration figures makes that

very clear." The State asked juror 105, "Do you think you'd make a good juror?", to

which they replied, "I do." The State also asked if juror 105 was worried about their

ability to serve, given their "notions about the way the system works." They responded,

---

[8] The State often started its questioning by referencing the jury questionnaire: "you indicated in your questionnaire . . . ," "I'm going to actually start with some follow-up about the answers that some of you folks gave in the questionnaires . . . ," and "I wanted to just dig right into your questionnaire."

"Not in particular. I think it's important to understand the background of the system that you're involved in to that extent." The State then moved on to questioning another juror.

Similarly, the State questioned juror 71,[9] who did not identify as a person of color, because they expressed "strong feelings about the criminal justice system." They stated they had "seen a lot of the systemic problems with the criminal justice system, especially of late" and acknowledged that "it's trying to be corrected, but still has a long way to go." The State followed up and asked juror 71 how they felt about participating as a juror given their opinions of the criminal justice system. They said they were unsure based on a past experience with witnessing a crime. After some discussion, the court explained "the role of the juror is to evaluate evidence critically. My only concern would be [ ] if you couldn't do that because you have such misgivings about the system," to which juror 71 responded, "I think I'd probably be able to be unbiased." The State also asked juror 24 about their "strong feelings about the criminal justice system" and impressions of jury selection. Juror 24, who did not identify as a juror of color, confirmed that they had strong feelings about the criminal justice system due to systemic issues that "aren't going to go away overnight." The State asked if the jury selection process had given them any faith in the system, to which they replied, "[I]t's definitely hard to say with just this being a couple hours, but this process is definitely not quite what I was expecting . . . I thought it would be, I guess more strict." Unlike juror 32, juror 24 did not ask the court any clarifying questions about the consequences of refusing to serve as a juror, nor did juror 24 indicate a need for reminders to perform their duties.

---

[9] The State used its fourth peremptory challenge on juror 71.

Therefore, in this case, the number and nature of the questions was generally the same—i.e., the State asked a similar series of questions to many jurors. As for jurors who raised concerns about the criminal justice system, the State asked jurors 105 and 71 how that viewpoint intersected with their ability to serve as a juror but did not ask either juror 24 or juror 32 this same follow-up question connecting the viewpoint with ability to serve.

Third, "courts should evaluate similar responses by other jurors who 'were not the subject of a peremptory challenge' by the party." Bell, 5 Wn.3d at 68 (quoting GR 37(g)(iii)). Here, jurors 19 and 75 also discussed implicit bias but did not express the same distrust of the system as juror 32. Juror 19, who identified as Asian, stated, "[T]here's obviously a lot of systemic bias and factors in the system like within everyone's minds that can affect that. So like even like as people try to be as fair as possible, sometimes like things will slip through the cracks." When asked "how that [bias] would work in terms of a wrongful conviction?" Juror 19 responded,

> [I]f for example, the jurors have some sort of unconscious bias towards like people of certain race or gender or background, that can . . . affect their views even like beyond the evidence that's presented, . . . if their own like previous experiences are impacting their verdict more than the evidence.

Juror 19 was not asked further questions during this exchange.

When defense counsel generally asked the panel, "Is there something underlying that we should know about you that we haven't asked that we don't know that could impact whether or not Mr. Pay-Pay actually gets a fair trial?", Juror 75, who did not identify as a person of color, responded that they grew up "on the east coast in the south" and in a "white bubble," but since living in Seattle, had "grown a lot and pushed

18

outside of that." When asked, "Is there anything about that that gives you pause in relation to whether or not you can help us to make sure that Mr. Pay-Pay is treated fairly under our system of justice?", Juror 75 answered, "I think that it's always an underlying thing for me, but I think I'm very culturally aware and cautious." Juror 75 was not asked any additional questions.

Jurors 19 and 75 were not subject to peremptory strikes from the State and were ultimately seated as jurors. When evaluating "similar responses by other jurors who 'were not the subject of a peremptory challenge' by the party." Bell, 5 Wn.3d at 68 (quoting GR 37(g)(iii)), Jurors 19 and 75 discussed their awareness of implicit bias but did not express uncertainty about their ability to serve or Pay-Pay's ability to receive a fair trial and were not asked additional questions.

Fourth, "courts should also assess whether the State's given 'reason might be disproportionately associated with race or ethnicity.' " Id. (quoting GR 37(g)(iv)). "[E]xpressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling" is a "presumptively invalid" reason. GR 37(h)(ii).

Here, the State's given reason for striking juror 32 was "the juror's self-described what we perceived as a hostility to the system of justice," as well as "the juror's admitted bias and the juror's expressed belief that they could only set aside that bias with what is essentially would be a great deal of effort and constant and daily written reminders about the need to set aside that bias in order to fairly evaluate this case." The State's reason did not rely on "distrust of law enforcement," which is a presumptively invalid reason for a peremptory strike under GR 37(h)(ii); rather, it distinguished juror 32's "feelings of complicity" related to participating in a "militaristic," "imperialistic," and

19

"violent" system and juror 32's questions about the consequences of not participating in jury service despite being selected as not "just a distrust of the system, but instead actual opposition to it."[10] When the court later asked juror 32 about their ability to be a juror given their strong views, they believed they could serve as a juror and confirmed that they could three times after that. But each of these times, juror 32 conditioned their ability to serve as a juror on the need for repeated written reminders to process information and remember their responsibilities. The State's reasons for striking juror 32 are not disproportionately associated with race or ethnicity; they reflect a challenge grounded in juror 32's answers that conditioned their ability to serve on repeated written reminders.

Lastly, as to "whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present or in past cases," GR 37(g)(v), the State exercised its other five peremptory challenges against prospective jurors who did not identify as people of color. During voir dire of the first jury panel, which the trial court dismissed due to defense counsel's medical issues, 33 prospective jurors identified as people of color, and the State exercised all of its challenges against prospective jurors who did not identify as people of color. Fourteen jurors were selected and five people of color ultimately served on Pay-Pay's jury, four of whom identified as Asian.

Here, juror 32 was the only juror to express such concern with the criminal justice system that only with regular, repeated reminders of their obligation to be fair could they fulfill their duties as a juror. Applying GR 37(e), in light of the totality of circumstances,

---

[10] The State also highlighted in its reasoning that juror 32 discussed being "biased," but it did not excuse juror 32 for cause.

we conclude an objective observer could not view race or ethnicity as a factor in the use of the peremptory challenge against juror 32. The court did not err in denying the GR 37 objection to the State's striking of juror 32.

II. Evidence Admitted under ER 404(b)

Pay-Pay challenges the admission of "copious evidence of gang affiliation" under ER 404(b). Ordinarily, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." State v. Yarbrough, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009). "Gang evidence falls within the scope of ER 404(b)." Id. "[B]efore a trial court may admit such evidence, it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." Id. at 81-82. "The preponderance of the evidence standard requires that the evidence establish the proposition at issue is more probably true than not true." Mohr v. Grant, 153 Wn.2d 812, 822, 108 P.3d 768 (2005). "We review ER 404(b) evidentiary rulings for abuse of discretion." State v. Embry, 171 Wn. App. 714, 731, 287 P.3d 648 (2012). "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." Id. at 731-32.

Initially, the State offered around 75 distinct exhibits consisting of videos, messages, and photos that were saved to Snapchat accounts belonging to either Pay-Pay, Sharif, or Mohamed. The State asserted various purposes for the evidence, including motive, opportunity, intent, identity, affiliation, acting in concert, and a "tacit

admission." After the pretrial hearing, the State narrowed its request to approximately 40 items. The trial court entered an order excluding some items, admitting some items—with the expectation some would be redacted—and reserving ruling on some. The court also instructed the jury that certain evidence had been admitted only for a limited purpose and, for each such piece of evidence, identified the respective limited purpose. On appeal, Pay-Pay explicitly challenges several pieces of evidence that were admitted and later used at trial.

A.  Admission of Evidence of Group Affiliation

Pay-Pay challenges the admission of evidence of his affiliation with the Holly Park group,[11] primarily on the basis that it "lacked a nexus to the charged offense" and because it was unduly prejudicial. We disagree.

As an initial matter, we note that Pay-Pay contends generally that the trial court erred when it "admitted multiple photos and videos as evidence of [his] affiliation and, thus, a motive to kill [] Richardson." However, in his briefing, Pay-Pay discusses only one specific video saved to his Snapchat account on December 12, 2019, and "a photo and video made by Mr. Mohamed *after* the incident as evidence of Mr. Pay-Pay's motive." While the court did admit the photo,[12] the State did not use this exhibit at trial, so we do not address Pay-Pay's challenge thereto. As for the "video made by Mr. Mohamed," Pay-Pay does not describe the video and provides no analysis or legal authority supporting his arguments.[13] "The brief of the appellant . . . should contain . . .

---

[11] The trial court ruled that the term "gang" could not be used at trial.

[12] The trial court admitted the photo, Item 54, for the purpose showing "[m]otive (inference of souvenir taking)" and described it as "a screenshot of an Instagram post that says 'Rest in Peace Tanna Money.' "

[13] While Pay-Pay fails to describe this video, we can deduce from the record citation in his briefing that this exhibit was Item 55, described in the court's order as a "selfie-style" video of Mohamed "seated inside a car, rapping to a Tanaa Money song and then flashing a GGG gang sign. Mohamed's

[t]he argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). Accordingly, we decline to consider Pay-Pay's challenges to evidence that he failed to identify with specificity and that lacks citations to the record or that he fails to support with legal authority and analysis. We thus address only his challenge to the admission of the December 12 video as improper "gang" evidence.

The State sought to admit the December 12 video as evidence of motive and intent. A narrator can be heard saying, "GGG K bitch," and an overlay of text added to the video says "GGGK bitch" and two crying-face emojis. The State reminded the court that "GGG K" indicated "GGG killer." The video shows several firearms, which the State identified as four "Glocks," something akin to an "assault weapon," two guns in the left-hand portion of the video that "are clearly not Glocks," and a gun viewable at the end that did not resemble a "Glock."

The court expressed concern and stated that the evidence of the "Glock" was "consistent with what was fired. [But] I'm not willing to include all the guns that are depicted in this video. Because otherwise it's just showing access to guns." The court ruled that the "portion of the video where the narrator is zooming in on the 4 firearms while saying 'G-G-G-K Bitch' is admitted [and] [t]he overlay is admitted." However, the court ordered the State to redact "the other firearms" in the December 12 video.

---

face is obscured by a Snapchat pixelation filter," "overlaid by a "sadface" or "frowning" emoji and the words 'Winter Fails.' " The court admitted this video to show motive. The full extent of Pay-Pay's argument regarding this video is that he "is not depicted in the images and did not save the images to his account," he "was not aware of the photo or video," and "there was no testimony that this general rivalry was likely to result in violence"; therefore, "the jury could only conclude that all gang members are inherently violent people who have a desire and propensity to indiscriminately kill all members of a rival gang."

At trial, the State introduced the December 12 video through Dan Finan, a police officer with the city of Bellevue who "specialize[s]" in "social media investigations. Finan testified that the first video was saved to Pay-Pay's account on December 12, 2019, with the overlay "GGGK bitch" and two crying-face emojis. The video was played for the jury and Finan stated that based on a prior interview with Pay-Pay, he believed it was Pay-Pay's voice in the video stating "GGG K bitch." Finan testified that placing a K after a name typically indicated "kill" or "killer," and that he would interpret "GGG K" as something typically posted by a rival to the GGG group "indicating that they were GGG killer."

Ordinarily, "there must be a nexus between the crime and the gang before the trial court may find the evidence relevant." Embry, 171 Wn. App. at 732. Here, in admitting the December 12 video, the court found the requisite nexus and determined the evidence was relevant to prove an element of the crime:

> I don't disagree that just a general statement of animosity towards GGG might not be terribly pertinent. A statement of animosity that includes a reference to killer and focuses in back and forth on at least one gun that could have fired the bullet, it looks like, and includes this crying pair of emojis, okay, sounds like more than, I just don't like GGG. It sounds more like a threat.
> And the other thing I will say here is that Mr. Richardson doesn't have to have been targeted for being Mr. Richardson for the State to have motive evidence. I mean, the fact that he affiliates so strongly just a few months before in his video with GGG and actually even closer in time with GGG, I mean, I think that one of the pictures the State has of him affiliating is within like a day of his death. The fact that he associates strongly with GGG and then the statement of animosity from your client tends to be kind of pertinent to me.
> . . . .
> And I think a reasonable inference arises that when somebody strongly affiliates with a member of a rival enemy group for whom one has homicidal feelings, that maybe that might be the motivation for pursuing them that night and firing at them. I'm not saying that's how it was. I'm saying it's reasonable.

We conclude the trial court did not abuse its discretion when it admitted the challenged video evidence under ER 404(b).[14] First, Pay-Pay claims the court did not satisfy the first step of the ER 404(b) analysis because it never found that the prior bad acts occurred. But even if a trial court does not specifically reference the preponderance of the evidence standard, "a trial court need not explicitly do so when performing an ER 404(b) analysis, so long as a finding that the standard has been met can be implied from a record clearly demonstrating as much." State v. Arredondo, 188 Wn.2d 244, 258, 394 P.3d 348 (2017). Here, the record meets that standard. At the hearing on the ER 404(b) evidence, the State proffered the video and stated Finan would provide supporting testimony. In its oral ruling, which was incorporated into the written order, the court stated that unless it heard a good reason why there was a problem with the foundation for this evidence, "[i]t shows what it shows."

As to the second step of the ER 404(b) analysis, the trial court identified the reason for which the December 12 video could be introduced: to establish motive and intent.

Third, the court properly concluded the evidence was relevant to prove an element of the crime charged. To prove that Pay-Pay committed murder in the first degree, the State needed to show he, or an accomplice, acted with "a premeditated intent to cause the death of another person" and did cause the death of that person. RCW 9A.32.030(1)(a). " 'Intent' is the 'mental state with which the criminal act is

---

[14] Pay-Pay submitted a statement of additional authority identifying a case that addressed admission of evidence of the defendant's association with a gang. State v. Sanchez-Radilla, No. 59912-1-II (Wash. Ct. App. April 7, 2026) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2059912-1-II%20Published%20Opinion.pdf. However, the relevant portion of the case is unpublished and is not precedential. GR 14.1(a).

committed.' " Yarbrough, 151 Wn. App. at 84 (quoting State v. Tharp, 27 Wn. App. 198, 208, 616 P.2d 693 (1980)). " 'Motive' is an inducement which tempts a mind to commit a crime." State v. Boot, 89 Wn. App. 780, 789, 950 P.2d 964 (1998).

State v. Yarbrough is instructive as to when gang affiliation evidence can be relevant. 151 Wn. App. 66. There, the defendant argued that because he was convicted of murder in the first degree by extreme indifference, the gang-related evidence was not relevant to prove motive. Id. at 83. Division Two disagreed, reasoning that the fact that the defendant belonged to a gang and perceived the victim to be associated with a rival gang was relevant to establishing "an inducing cause" for the defendant to act with extreme indifference by shooting at the victim "only a few days after the two gangs had had a prior altercation." Id. at 84. As the trial court had reasoned, the gang affiliation evidence was introduced

> to show that as a member of an organization which apparently had hard feelings toward a different organization and the victim was a member of the different organization, . . . that of itself would provide an explanation why somebody would do [something] otherwise as inexplicable, if for no other reason, [as] shooting somebody.

Id.

Here, as in Yarbrough, the fact that Pay-Pay was associated with Holly Park and perceived Richardson to be associated with a rival group, GGG, is relevant to establish "an inducing cause," i.e., motive, for Pay-Pay to act with intent by driving the vehicle that followed and shot at Richardson. Similarly, as the trial court noted, the evidence created a reasonable inference as to why Pay-Pay would do something otherwise as inexplicable as following and firing at Richardson's car.

26

Moreover, at trial, the State produced evidence of a nexus between the crime and Holly Park affiliation. Cf. State v. Scott, 151 Wn. App. 520, 521, 213 P.3d 71 (2009) (while there were proper bases for admitting evidence of gang affiliation, it was improperly admitted when at trial, the prosecution failed to produce evidence that there was a nexus between the crime and gang membership). At trial, Finan testified that he had seen "group affiliation demonstrated through social media posts" during the course of his work and prior investigations. And evidence from social media accounts demonstrated Pay-Pay, Sharif, and Mohamed were associated with one another, as well as with others who were associated with the Holly Park neighborhood.

Finan also testified that he was familiar with GGG and Richardson, he knew that Richardson was associated with GGG, and that GGG had a particular hand sign that would demonstrate being a part of the group, which is something he saw frequently on social media accounts for people associated with GGG. Finan also confirmed his familiarity with the Holly Park neighborhood and the hand sign that demonstrated association with Holly Park. When he was asked what the addition of a "K" meant following a group name—like GGG K—he testified that would "typically be posted by somebody who was a rival to the GGG group or they were indicating they were [a] GGG killer."

As the court explained during its oral ruling, here, there was "a more complex story of motive" than simply based on group affiliation:

> When people affiliate strongly with a group and their group is not getting along with another group, then it's motive for someone to get involved in the conflict with the other person who belongs to the other group or with the other group as a whole. . . . Pay-Pay expresses a strong identification with his group, Holly Park . . . . Mr. Sharif does not identify that strongly

with Holly Park, but he identifies with Mr. Pay-Pay because . . . they've been friends for a long time. . . .

Mr. Mohammed seems more like Mr. Pay-Pay to me, somebody who strongly affiliates with Holly Park . . . . I don't see a lot indicating he is especially connected to Mr. Pay-Pay, although obviously they knew each other and they interacted.

. . . .

[T]o the extent that this small group of young men who the State has documentation via video were involved in the movements of the cars the night that Mr. Richardson was it looks like hunted down and killed, those affiliations are significant to showing that these people were in a position to know each other and to communicate with each other from their vehicles. That helps to explain the movements of the vehicles here.

Thus, the video evidence linked Pay-Pay, Sharif, and Mohamed to each other and helped explain each's motivation for working together to follow and shoot Richardson. The video surveillance evidence as well as geolocation evidence from the night of the murder also tied Pay-Pay, Sharif, and Mohamed to each other and to the vehicle that passed Richardson when he was shot.

Further, the admitted portion of the December 12 video demonstrated Pay-Pay's animosity toward GGG and showed several Glocks. Dijana Coric, a forensic scientist with the Washington State Patrol Crime Lab, testified that based on the size of the casings that were recovered in this case, the type of gun that could have been used was likely a "40 Smith and Wesson caliber type of firearm," which is usually a pistol and manufactured by a variety of companies, including Glock. Thus, taken together, the evidence showed a nexus between the affiliation evidence and the crime because it showed Pay-Pay's motive and intent, as well as the means.

Finally, the trial court did not abuse its discretion in ruling that the probative value of the evidence was not outweighed by its prejudicial effect.[15] During the hearing on the

---

[15] Pay-Pay argues that the court applied the wrong legal standard in analyzing prejudice because it stated it would read precedent "with a bit of a grain of salt" and "apparently believed Mr. Pay-Pay, who

28

ER 404(b) evidence, the court repeatedly expressed concerns about potential prejudice, expressly prohibited use of the word "gang," and excluded much of the evidence the State sought to admit, while allowing only non-cumulative evidence from a very limited time period leading up to and directly after the shooting. Further, the court's written order specified that it "balanced the probative value against the prejudicial effect of each of the above-listed Items on an individual basis, and has concluded that the probative value outweighs the potential prejudice for each of the above-listed items." The order also noted that the court "mitigated the potential prejudice of certain items by requiring the noted redactions and/or by admitting the Items only in part, or, for certain videos, only as still frames." Specifically, regarding the December 12 video, the court acknowledged at the ER 404(b) hearing that portions of it were "really prejudicial," particularly in relation to the excessive depiction of "other guns." Thus, the court ordered that this video be redacted and specified that the State would need to go "frame by frame and redact appropriately" so that the video focused only on guns that could have actually shot "the bullets at the scene according to the expert."

Moreover, the court gave the jury instructions limiting the purposes for which it could consider certain evidence, including that showing group affiliation. "We presume

is Native and Latino, would not be prejudiced by gang evidence because jurors now check racial bias." But Pay-Pay relies on an unpublished decision that has since been reversed by the Supreme Court on the relevant issue, State v. Stearns, No. 82125-3-I (Wash. Ct. App. Feb. 3, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/821253.pdf. In State v. Stearns, the trial court had concluded other wrongful acts would not be prejudicial if it gave a limiting instruction, noting it had sat as a visiting judge in other counties and that King County juries were "very fair population or they are not big fans of the police." 6 Wn.3d 304, 319, 585 P.3d 1281 (2026). This court held that the trial court abused its discretion "because its determination of prejudice was based on untenable grounds." Stearns, No. 82125-3-I, slip op. at 21. The Supreme Court noted that "[a] judge's subjective impression of jurors' attitudes toward the police based on the venue of the trial is not a relevant consideration" for the prejudice analysis. Stearns, 6 Wn.3d at 319. Nonetheless, the court's prejudice analysis was not based on "untenable grounds" because it concluded any prejudice could be addressed with a limiting instruction, and the jury is presumed to follow instructions. Id. at 319-20. Similarly, here, Pay-Pay's argument that the court applied the wrong standard for prejudice is unavailing.

that a jury will follow the instructions provided to it." State v. Mohamed, 186 Wn.2d 235, 244, 375 P.3d 1068 (2016); see also State v. Johnson, 29 Wn. App. 2d 401, 415, 540 P.3d 831 (2024) (applying presumption to limiting instruction regarding evidence of prior convictions).

Accordingly, the trial court did not abuse its discretion when it admitted the December 12 video with redactions and instructed the jury identifying and limiting the purposes for which it could be considered.

B. Evidence of Access to Firearms

Pay-Pay challenges the admission of "[p]hotos and videos of Holly Park members brandishing weapons" because the trial court "failed at all steps" of the ER 404(b) analysis. We disagree.

The jury viewed several[16] exhibits that were offered to show that not only did Sharif and Mohamed have continuous access to firearms, but they also had access to firearms that were consistent with the murder weapon used around the time of the murder:

- A still frame of a .40 caliber Glock pistol saved to Sharif's Snapchat account on December 20, 2019 (Exhibit 96, slide 14);[17]

---

[16] Pay-Pay states the court admitted "several" exhibits for this purpose, while the State states there were five exhibits. The appellate record and a comparison of the exhibits that were admitted in the court's written order on the State's ER 404(b) motion versus what those presented at trial shows four exhibits were admitted and shown to the jury: Item 24, admitted at trial as Exhibit 96, slide 14; Item 40, admitted as Exhibit 44; Item 52, admitted as Exhibit 96, slide 15; and Item 58, admitted as Exhibit 96, slide 15. The trial court also admitted Item 36, a video apparently saved by Pay-Pay on December 28, 2019, at 11:19 a.m. in connection to his Snapchat account showing multiple firearms, which the court admitted as a still frame. However, the record does not show that the State presented Item 36 to the jury.

[17] This exhibit was originally admitted as Item 24. Item 2—another image of a ".40 caliber Glock pistol" from November 28, 2019—was also admitted as a still frame with redactions as evidence of a "consistent firearm." During discussion of Pay-Pay's motion in limine, the trial court acknowledged that Item 2 was less relevant given the admission of Item 24. However, the court nevertheless admitted it in case the defense suggested that the gun was not connected to Sharif.

- A video that was saved to Mohamed's Snapchat account from December 29, 2019, at 6:49 p.m. depicting someone consistent with his appearance holding something similar to a Glock pistol (Exhibit 44);

- A still frame from a video saved to Mohamed's Snapchat account showing a .40 caliber Glock style pistol, dated December 30, 2019, at 6:24 p.m. (Exhibit 96, slide 15); and

- A photo of Mohamed holding a Glock pistol at his other hand, which was making a GGG sign, dated January 1, 2020, at 1:22 a.m. (Exhibit 96, slide 12).

Again, the court need not specifically state that the first ER 404(b) step has been satisfied—i.e., that the prior bad acts occurred—if it "can be implied from a record clearly demonstrating as much." Arredondo, 188 Wn.2d at 258. At the pretrial hearing, Pay-Pay did not address why the evidence lacked a sufficient foundation, and lacking that argument, the court concluded the evidence "shows what it shows" and "look[ed] like photographic evidence" that was normally admissible.

Regarding the second element, the purpose for which this evidence could be used, the court admitted the exhibits for the purpose of showing a "consistent firearm." At trial, the court instructed the jury that it could consider these exhibits only "to the extent you find it relevant to issues of . . . access to a consistent firearm," except for Exhibit 44, which it could also consider to the extent it found it relevant to issues of identity.

Pay-Pay argues that the evidence of Sharif and Mohamed with the firearms was not relevant. At trial, the State did not argue that Pay-Pay had shot at Richardson. Rather, the State's theory of the case was that Pay-Pay acted as an accomplice because he had driven the car that followed, shot at, and killed Richardson. Surveillance videos and geolocation data placed Mohamed and Sharif in Pay-Pay's car immediately before and after the murder. Thus, as the jury was instructed, to convict

31

Pay-Pay of murder in the first degree as an accomplice, the State needed to show that Pay-Pay either solicited, commanded, encouraged, or requested Sharif or Mohamed to commit the crime, or aided or agreed to aid Sharif or Mohamed in planning or committing the crime.[18] As discussed above, Coric, the firearms analyst, concluded that the fired casings recovered from the scene were .40 caliber, and that the pin marks indicated two different firearms were used. No murder weapon was recovered. Coric testified that a Glock-style .40 caliber pistol could have been the style of weapon used in the murder.

Here, the trial court recognized that because no murder weapon was retrieved, the question revolved around whether "these particular young m[e]n ha[d] access to guns that could have fired the bullets." The court went on to discuss that the images admitted were "close in time" to the murder, "before the event," and that "they have to be the right make and model." We conclude the trial court did not abuse its discretion by determining that the challenged exhibits were relevant.

As to whether the prejudicial effect outweighed the probative value, the court stated it was "on the fence with regard to the firearm issue," but noted that "[t]he significance of the firearm evidence is to the extent that the defendants allegedly displayed themselves with firearms that are consistent with firearms used in this shooting."[19] Recognizing that not "every single picture with a gun is pertinent here, it doesn't mean every kind of gun is pertinent here, but access to the particular type of gun allegedly used here may well be pertinent," the court limited the evidence to only

---

[18] The jury instruction was the same as that in the pattern instructions. See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 (5th ed. 2021).
[19] The court consistently stated that only guns that can be confirmed to fit within the category of possible murder weapons will be shown.

four items. The first showed Sharif had "access to a consistent firearm" nine days before Richardson's murder, and the court allowed only a still frame from the video showing a Glock .40 caliber pistol and required that the second firearm and extended magazine be redacted. The court also admitted a video and an image indicating Mohamed had access to a consistent firearm approximately two hours before the murder. Finally, the trial court admitted an additional photo of Mohamed following the murder, determining that this photo was highly probative to the State's case because it showed a firearm consistent with the previous two photos and it depicted Mohamed pointing the Glock "at a GGG reverse gang sign," a sign of disrespect, but required the State to redact the other two individuals, including a person who was "throwing up" a Holly Park sign. The court stated multiple times that the word "gang" could not be used and that images of guns other than those admitted, as well as money, would be redacted, so they were "not going to get into anything at all that suggests outside criminal activity other than access to guns that could have fired these shots close in time to the murder."

Thus, the trial court excluded many of the State's proffered ER 404(b) exhibits, and for those exhibits allowed for the purpose of showing access to firearms consistent with the one used to shoot Richardson, limited them further by requiring redactions and still images instead of video. The court did not abuse its discretion in determining the probative value of this limited number of exhibits outweighed any unfair prejudice and admitting them under ER 404(b).

33

C. "Bingo Card"

Finally, Pay-Pay argues that "a post-shooting photo created by an unknown user was not a tacit admission" and was therefore improperly admitted. We agree that it was error to admit it but conclude that the error was harmless.

The challenged evidence, also referred to as the "Bingo Card," was a screenshot allegedly saved to Pay-Pay's Snapchat account that depicted a nine-photo chart of GGG members with Richardson in the middle photo and the word "wasted" spelled over Richardson's face. The caption below says "eight more [n-words] to go AG for L" and was dated February 14, 2020. When the court asked during a pretrial hearing what the "AGL" stood for, the State suggested it was a reference to "Aiden Getty for Life," a person associated with Holly Park who had been killed that month. The Bingo Card was posted to a "fake Instagram" account with the name "tanaamoneykillergggk." The State did not present evidence as to who created the fake account but argued that Pay-Pay's act of saving the same chart to his account indicated his involvement. The trial court ruled that Pay-Pay could request that "AG4L" and "Rest in Peace Brother" with accompanying emojis be redacted. The court ultimately admitted the Bingo Card to show "existence of conflict/tacit admission." Pay-Pay elected not to request a limiting instruction that would identify the exhibit as a "tacit admission."

The trial court identified the same bases to admit the evidence as in the State's proffer in the pretrial motion. It recognized that the Bingo Card could be "reasonably read as bragging about [] Richardson," and that the reference to "somebody that's Holly Park and rest in peace . . . suggest[s] this was created by Holly Park, and that's why [] Pay-Pay saved it." The court also noted multiple times that the fact that Pay-Pay "saved

it . . . doesn't rule out that he created it either . . . it's arguably very pertinent." While acknowledging that the evidence was highly prejudicial, because the statement "eight more [n-words] to go" was a future threat to others unrelated to the case, the court reasoned that "on the other hand, it seems to be a reference as well to somebody who is no longer is to go . . . somebody who's been taken care of."

We agree with Pay-Pay that even if initially the court properly admitted the evidence under ER 404(b), ultimately, the testimony at trial fell short of connecting Pay-Pay to the item. See Scott, 151 Wn. App. at 528 (evidence of gang affiliation was improperly admitted when prosecution failed to produce evidence that there was a nexus between the crime and gang membership). At trial, Finan identified the screenshot of the Bingo Card and confirmed it was "saved to a group chat on February 14, 2020, at approximately 1:59 a.m." He testified that the Bingo Card depicted a screenshot from an Instagram account titled "Tanaa money killer, GGG K," and "the photo displays a checkerboard of nine photos in which James Richardson is depicted in the middle photo with an overlay reading 'wasted.' " Finan confirmed the surrounding photos were of close friends of Richardson. Based on the caption—"8 more N's to go"—Finan interpreted the photo to mean "they had gotten one of the group and they were intending to kill the remaining eight." On cross-examination, Finan confirmed that the Bingo Card was not saved to an account; rather, it was saved to a group chat that included Pay-Pay, and there was no indication that he or someone else within the chat saved the photo. Accordingly, because the testimony did not directly connect Pay-Pay to the Bingo Card, as the State originally theorized from his act of saving it, it was error to admit the photo.

Erroneous admission of evidence under ER 404(b) "requires reversal only if the error, within reasonable probabilities, materially affected the outcome." State v. Stenson, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997). Here, Pay-Pay cannot show with reasonable probability that the admission of the photo materially affected the verdict within the context of the entire case. Taken together, surveillance videos and geolocation data showed that a silver Impala matching Pay-Pay's vehicle carried him, Sharif, and Mohamed and followed Richardson through Georgetown and across the First Avenue Bridge and that these events occurred minutes before Richardson's murder. Surveillance video and geolocation data also showed Pay-Pay, Sharif, and Mohamed together and washing Pay-Pay's silver Impala in Lakewood less than one hour after the murder. Thus, while the Bingo Card photo was improperly admitted, its admission was harmless error in light of the other evidence of guilt.

We also reject Pay-Pay's claim that the admission of "copious gang evidence" violated his right to a fair trial. Pay-Pay contends that an evidentiary error can deprive a petitioner of due process, citing In the Matter of Quintero, 29 Wn. App. 2d 254, 541 P.3d 1007 (2024), and State v. Scherner, 153 Wn. App. 621, 225 P.3d 248 (2009). However, as Pay-Pay acknowledges, in Quintero, the court treated the alleged evidentiary errors as nonconstitutional because "Quintero fail[ed] to argue how these evidentiary errors violated his constitutional due process rights." 29 Wn. App. 2d at 304-05. Pay-Pay's due process claim suffers the same failing. Even though a due process claim based on evidentiary errors can be cognizable,[20] here, Pay-Pay's argument is that "[g]iven the

---

[20] The U.S. Supreme Court has recently acknowledged that "the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." Andrew v. White, 604 U.S. 86, 96 (2025). But Pay-Pay neither cites to Andrew nor provides argument that supports a due process claim based on admission of evidence in this case.

paucity of evidence connecting Mr. Pay-Pay to the shooting, the State cannot prove the error was harmless beyond a reasonable doubt." This is insufficient to explain why the trial court's application of ER 404(b) establishes a constitutional claim as opposed to an evidentiary error. Accordingly, we reject his due process claim based on the admission of gang evidence.

III.  Admission of Surveillance Videos

Next, Pay-Pay argues that "[t]he State failed to lay a foundation for surveillance videos near the shooting, requiring reversal." Specifically, he challenges the admission of surveillance videos from the La Hacienda hotel, the Seattle Design Center, and the Martin Court Apartments. He contends the exhibits lacked foundation because the witnesses "lacked firsthand knowledge of the events, did not extract the video, and did not view the video until meeting with the prosecution in preparation for trial."[21]

We review a trial court's decision to admit or exclude evidence for abuse of discretion. State v. Sapp, 182 Wn. App. 910, 914, 332 P.3d 1058 (2014). "Under ER 901, a party may authenticate a recording through, 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' " Id. (citing ER 901(a)). " 'The bar for authentication of evidence is not particularly high,' " and "the proponent need not 'rule out all possibilities inconsistent with authenticity.' " State v. Hillman, 24 Wn. App. 2d 185, 191, 519 P.3d 593 (2022) (quoting United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007)).

To authenticate video recordings, "the proponent must put forward a witness 'able to give some indication as to when, where, and under what circumstances [a

---

[21] Pay-Pay objected at trial to each of the challenged surveillance videos on the same basis: lack of foundation.

video] was taken, and that the [video] accurately portrays the subject illustrated.' " Sapp, 182 Wn. App. at 914 (quoting State v. Newman, 4 Wn. App. 588, 593, 484 P.2d 473 (1971)). A video recording does not need to be authenticated by a witness who was present at the recording. Id. at 915. "Rather, the trial court may consider any information sufficient to support the prima facie showing that the evidence is authentic." State v. Williams, 136 Wn. App. 486, 500, 150 P.3d 111 (2007) (addressing sound recordings). For example, in Sapp, which involved sex offenses, the defendant argued that either he or the minor child needed to authenticate photographs in which they appeared. 182 Wn. App. at 912. Division Three of this court disagreed, reasoning that "a witness with prior knowledge of the people and places depicted in the exhibit could still establish when the exhibit was created based on the age of people in the exhibit or things depicted in the background." Id. at 915. Accordingly, it held the "victim's grandmother adequately authenticated the photographs and video recordings in [the] case when she identified the individuals in the exhibits, the victim's approximate age, and the location depicted in the exhibits." Id. at 916.

As in Sapp, here, the testimony was sufficient to support a determination that the surveillance videos are what the State claimed them to be. Parnit Singh, a manager and owner of the La Hacienda Hotel since 2012, testified about the hotel's surveillance footage. Singh testified that in December 2019, the hotel maintained seven surveillance cameras, all outside save one inside the lobby. She explained that the hotel's own computer stored the video and she could download the video from the program itself. Singh confirmed the video included date and time stamps, which were "very accurate" because they were "set with the computer" so matched the computer's date and time.

She further stated that a few weeks prior to trial she had reviewed with the State the video and pictures from her cameras that she had provided. Finally, she confirmed that she had initialed and dated the flash drive marked as State's Exhibit 30 and that it contained video from La Hacienda's cameras.

Similarly, testimony of Richard Seges was sufficient to authenticate the Seattle Design Center video. Seges established when, where, and under what circumstances the video was recorded and that it accurately portrayed the area around the Seattle Design Center on December 29, 2019. First, he testified that he worked for Greenbridge Management and that Seattle Design Center was one of the real estate assets they managed. He explained that he had an overall responsibility for his employer's properties including the Seattle Design Center and oversaw the team responsible for the security cameras. Seges testified that he was familiar with how the surveillance system worked and that the security system maintained 25 cameras monitored by his team. He specified where each of the cameras and the security system's server were located. Seges testified that he found the surveillance system "very" reliable, and that in his three and a half years with the company, they "ha[d] never had an incident where if something was captured on film the time stamp . . . was incorrect." Seges testified that if he wanted to view surveillance video, he would go to the person on the team who manages it and ask to view it, though he himself did not know how to pull it up. He testified that he reviewed the video with the State, confirmed he recognized it as from the Seattle Design Center because it was very "easy to recognize" their property, and stated that the date and time stamp accurately reflected when the video was taken.

Finally, he confirmed his signature on a flash drive marked as State's Exhibit 32 and that it contained video from the Seattle Design Center.

Finally, the property manager of the Martin Court Apartments, Melissa Dendy, sufficiently authenticated the video footage pulled from the apartments' surveillance system. Dendy confirmed she was familiar with the surveillance video system at Martin Court, specified the system included 29 cameras, and testified that she watched footage from the system every day. She stated that the system was "in perfect working condition," was "always maintained," and that "the date the time and the images are always in excellent working condition." Dendy testified that she was not aware of any issues with the system before she transferred to the location, and if there were, as the property manager, she would have been made aware of them. She confirmed the video system included date and time stamps and she thought "[a]bsolutely" it was accurate and reliable. Additionally, Dendy testified that although she did not retrieve the surveillance videos for law enforcement in 2019 and 2020 because she did not work at Martin Court at that time, she had subsequently reviewed the videos with the State and confirmed they were from Martin Court. She recognized the images as Martin Court's because they had Martin Court's documentation on them and were "the exact images from [Martin Court's] cameras." She recognized the flash drive with the videos she had viewed, State's Exhibit 34, because she had initialed it and written her name on it.

Singh, Seges, and Dendy each testified as to when, where, and under what circumstances the respective video was taken and that the video accurately portrayed the subject shown. Therefore, we conclude the trial court did not abuse its discretion

when it concluded their testimony was sufficient to authenticate the videos from La Hacienda Hotel, Seattle Design Center, and Martin Court Apartments, respectively.

### IV. Prosecutorial Misconduct

Pay-Pay asserts the prosecutor committed reversible misconduct by arguing facts not in evidence, shifting the burden to defense, and invoking the jurors' oath. We disagree.

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). If "we find that a prosecuting attorney's statements were improper, we must then determine whether the defendant was prejudiced under one of two standards of review." State v. Allen, 182 Wn.2d 364, 375, 341 P.3d 268 (2015). If the defendant made a timely objection at trial, they must demonstrate the prosecutor's improper conduct " 'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.' " Id. (quoting State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) " 'no curative instruction would have obviated any prejudicial effect on the jury' " and (2) the misconduct resulted in prejudice that " 'had a substantial likelihood of affecting the jury

verdict.' " Id. at 760 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

### A. Facts Not in Evidence

In closing, the State presented a PowerPoint that included the instructions the jury would receive as well as photos that were admitted as evidence. Specifically, the State presented three slides of stilled images from the surveillance video footage taken throughout Georgetown with a still image of Pay-Pay's license plate from the Classy Chassis surveillance footage "overlaid" onto the stills. Before closing argument began, Pay-Pay objected to these images, requesting the State redact the license plate. The court overruled the objection, noting that the State is permitted to draw reasonable inferences from the evidence "[a]s long as they don't represent the license plate was taken in the area of the shooting."

On appeal, Pay-Pay claims that presenting the slides during closing was misconduct because the slides admitted into evidence did not include the license plate image. "[A] prosecutor commits reversible misconduct by urging the jury to decide a case based on evidence outside the record." State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). The State relies on evidence outside of the record when it submits material to the jury that was not properly admitted as evidence at trial. Glasmann, 175 Wn.2d at 714 (holding State's "presentation of a slide show including alterations of . . . [a] booking photograph by addition of highly inflammatory and prejudicial captions constituted flagrant and ill intentioned misconduct that requires reversal."). However, "[i]n the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw

reasonable inferences from the evidence." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). For example, in State v. Rodriguez-Perez, the court held the State's closing argument was not misconduct when its PowerPoint and accompanying captions were "directly linked to the evidence and were helpful to the jury's understanding of it." 1 Wn. App. 2d 448, 465, 406 P.3d 658 (2017).

Here, all the photos included in the slides were admitted into evidence. The stills from the Classy Chassis surveillance footage were clear enough to depict the car's license plate number, which established it was Pay-Pay's silver Impala. John Brody Ford, a detective with the Washington State Patrol, testified to a "general description" of the silver Impala based on the video from Classy Chassis and photos of the car that Pay-Pay posted to his Snapchat.[22] Ford repeatedly noted that the silver vehicle that followed Richardson out of the Jack in the Box parking lot to Kittens Cabaret and eventually onto First Avenue Bridge, which led to SR 509, shared various features with Pay-Pay's silver Impala. Ford also noted that the taillights on the silver vehicle in the surveillance footage were distinctive and, based on his experience, an uncommon feature, because they were "in the same plane as the right and left rear brake light[s]," as opposed to "up in the window."

When the State showed the stills that included Pay-Pay's license plate during closing, it detailed the supporting evidence, particularly Ford's testimony in which he "identified all of the distinctive features of the car, the Chevy Impala, and explained why

---

[22] Detective Ford specified that the car had "silver tones for the color," the front grill "looks like . . . a Chevy emblem," "the rims are silver," "the windows are dark tint," including "the front and back window," "there is black weather stripping . . . on the roof . . . on top of the doors, that goes from the front to the back windshield," and "[a]lso . . . the front and back door has that protective thin strip[p]ing like a guard along the side of it from the back towards the front."

he believed in his opinion that it was a Chevy Impala, . . . includ[ing] the fact that [he] actually drove a Chevy Impala as a trooper with the State Patrol." The State argued that the reasonable inference was that the vehicle was Pay-Pay's silver Impala because of the Impala's distinctive shape of the brake lights. After describing this inference, the State emphasized, "at the end of the day, whether it's a Chevy Impala or not, that's within your purview."[23]

While the exhibit with the license plate was overlaid onto the three images in the State's slideshow, the State never suggested that this composite was actually itself a single photo or video. The State also explicitly acknowledged that "[t]here is no video that shows who the driver is in Georgetown. There is no license plate on the car in Georgetown." Accordingly, it was not improper for the State to present photo evidence in order to compare distinctive features of Pay-Pay's silver Impala with the silver vehicle and suggesting that the reasonable inference was that it was Pay-Pay's vehicle in the videos.

---

[23] The State further explained the evidence supporting the inference:

When you watch the Demolition Man video and the South Transfer Station video, sort of far away; right? And everyone agrees you can see it is a silver car, but you can't tell what type of car it is just based on those two videos and what they show. I'm not going to stand up here and tell you that you can. But there are certain features of that silver car that you can see in all the other surveillance videos. And based on the sequence of events that occurred before the shooting and after the shooting, the reasonable explanation, the common sense explanation and the only explanation that is supported by any evidence in this case is that it was the same car that drove by Martin Court, then showed up at Jack in the Box, then left Jack in the Box and followed Mr. Richardson to Kittens, then circled around the block and hid behind the dumpster, and then followed Mr. Richardson again as he left Kittens, made a left on Fourth, drove south to -- on Fourth to Michigan, and then turned right on Michigan to the entrance of the bridge. . . . [T]he sequence of events is really, really critically important. That sequence . . . that's one of the pieces of evidence that proves that the shooter car was the Impala even if you can't clearly see that it is an Impala on the Demolition Man and South Transfer Station videos.

44

Pay-Pay also argues that it was improper for "the State [to] manufacture[] a map purportedly showing the route he traveled" to enter the Mount Baker neighborhood. Sean Kennedy, an employee of the Federal Bureau of Investigation, testified that he created the map, and it details cell site location and geolocation data related to Sharif and Pay-Pay. The map as admitted into evidence also included an address—"2820 MLK Jr. Way S." In his testimony, Finan separately noted that the most direct route from the cell phone tower that indicated Pay-Pay's location at 7:31 p.m. to the Lao restaurant is to follow MLK Jr. Way South and that geolocation data associated with Sharif indicated he was traveling northbound on MLK Jr. Way South around that same time. Finan also testified that Sharif's geolocation data indicated he remained at the Lao restaurant from 7:35 p.m. to 7:59 p.m., and later, his location data from 8:26 p.m. to 8:29 p.m. was consistent "with someone traveling westbound from Holly Park towards the Georgetown area."

In its closing argument PowerPoint, the State added labels to the map that indicate cell site data, the major street connecting the data, and addresses where phone calls were made. The map correctly noted the southernmost "red wedge" represented Pay-Pay's phone connecting to a cell tower at 7:31 p.m. in association with a call to the Lao restaurant. Similarly, based on Finan's testimony and geolocation data, the State affixed a "green wedge" on the map to identify where the "Sharif phone call" at 7:51 p.m. occurred. The map also correctly labeled MLK Jr. Way South with a dotted line, and it also accurately labeled the address of the Lao restaurant that Pay-Pay called at 7:31 p.m.

Based on this evidence, the State argued that the reasonable inference from the evidence was that Pay-Pay drove from the Tacoma area, picked up Sharif along the way to the Lao restaurant, spent approximately 25 minutes at the Lao restaurant, and then the two drove toward Georgetown, where Richardson was located. The map had been admitted into evidence. While the State affixed labels to the map for the PowerPoint used during its closing argument, those additions were to demonstrate the reasonable inferences from the evidence admitted at trial. Therefore, the State did not engage in misconduct by adding labels to the map that illustrated the State's theory of the timeline and identified the locations and times that Pay-Pay met up with Sharif and drove toward Georgetown.

B. Shifting the Burden of Proof

Pay-Pay also contends the "prosecutor squarely shifted the burden to [him] . . . [by] emphasizing the defense's failure to present evidence. He did not contemporaneously object to any of the challenged comments. This argument fails.

"A criminal defendant has no duty to present evidence, and it is error for the prosecutor to suggest otherwise." State v. Osman, 192 Wn. App. 355, 366, 366 P.3d 956 (2016). Thus, a "prosecutor may commit misconduct if [they] mention[] in closing argument that the defense did not present witnesses or explain the factual basis of the charges or if [they] state[] that the jury should find the defendant guilty simply because [they] did not present evidence to support [their] defense theory." State v. Jackson, 150 Wn. App. 877, 885, 209 P.3d 553 (2009). However, "a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case." Osman, 192 Wn. App. at 367. Moreover, "[a] prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument, the issues in the case,

46

the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 940 P.2d 546 (1997).

In closing, Pay-Pay emphasized that the evidence did not bear out the State's theory and that specifically no evidence definitively placed Pay-Pay within the silver vehicle, let alone in the Georgetown area. During the State's rebuttal, preceding the challenged comments, the State underscored that the jury was the ultimate trier of fact. Then, in the argument at issue, responding to Pay-Pay's theory, the State asked the jury, "What else would have to be true if it wasn't [ ] Pay[-P]ay and it wasn't him driving the Impala?" The State highlighted that the silver vehicle did not appear in the video footage after Richardson's shooting.[24] The State then contended that if it was not Pay-Pay driving his silver Impala, then "[i]t would mean that a completely random silver car that was never seen before that night, never seen following [] Richardson's car, just happened to be crossing the bridge after he did and just happened to speed up and just happened to open fire on [] Richardson . . . for no apparent reason."

The State argued that the only reasonable inference from the geolocation data and surveillance footage supported its theory that Pay-Pay, Sharif, and Mohamed met in Georgetown and proceeded to follow Richardson:

> It would mean that there is some other reasonable explanation, some other explanation at all for how [] Sharif and [] Mohamed got into [] Pay[-P]ay's Impala before the three of them showed up together at Classy Chassis less than an hour after the shooting. Despite there being no evidence, no evidence whatsoever of how and where and when they got into the Impala other than what has been shown to you on surveillance video and with phone location data and phone records and geolocation data and those Snapchat records. The only explanation . . . that is

---

[24] The State noted that there was no evidence of the silver Chevy Impala that had been following Richardson "in Georgetown after 8:37 [p.m.] when it turns right on Michigan Street two minutes before [] Richardson's murder." The State then repeated there was "no evidence of the Impala at 8:39 p.m. at the time that the shooting happens" or after 8:39 p.m. in Georgetown.

> supported by the evidence in this case is that [] Pay[-P]ay picked up []
> Sharif in Holly Park at 7:30 [p.m.], they drove north on MLK, they drove
> down into Georgetown at 8:29 [p.m.], that's why [] Pay[-P]ay's Impala is
> driving right in front of the Martin Court apartments. They met [] Mohamed
> at the Jack in the Box parking lot at 8:30 [p.m.] and then they started to
> follow [] Richardson all around Georgetown.

The State also commented that if it was not Pay-Pay in the silver vehicle, "[i]t would mean that somewhere out there are mystery killers who [are] also in a silver car that night and who were also in the same place and same time as someone who has expressed a motive to kill a GGG like [] Richardson."

"A prosecutor does not commit misconduct by arguing that the jury would have to disregard the evidence in order to reach a certain result." See State v. Coleman, 74 Wn. App. 835, 838, 876 P.2d 458 (1994). In the challenged portion of the rebuttal argument, the State was responding to Pay-Pay's closing argument and arguing that the only reasonable inference from the evidence was that Pay-Pay, Sharif, and Mohamed were in Pay-Pay's silver Impala, which followed Richardson from Georgetown to the site of the shooting. Accordingly, we conclude that the State did not improperly shift its burden, as it was entitled to argue the reasonable inferences based on the evidence and highlight the improbability of the defense's theory.

C. Juror's Oath

Pay-Pay additionally challenges as misconduct a portion of the State's rebuttal argument as "directly linking a conviction with the jurors' willingness to fulfill their civic duty." Specifically, in its rebuttal, the State told the jury

> Each of you when we were doing jury selection, each of you expressed
> that you believe that you had the ability to fully, fairly, and impartially
> consider all of the evidence. You also told Judge Shaffer and then took an
> oath to follow the jury instructions. Do not take the easy way out. Do not
> take the easy way out and say, "Oh, well, [ ] Ford sat in the chair and he

said yeah, you know, well, I just looked at the surveillance video, and yeah I guess based on the surveillance video I can't rule the possibility that [] Pay[-][P]ay wasn't in the car." That's the easy way out. Don't take it.

Pay-Pay did not object to these comments.

In support of his argument, Pay-Pay cites to <u>Coleman</u>, in which the State told the jury they would "violate your [oa]th as jurors" if they convicted the defendant only of theft and not robbery. 74 Wn. App. at 838. The court held that it is plainly improper for a prosecutor to argue to the jury that it "would violate [the juror']s oath by accepting the defense theory of the case." <u>Id.</u> at 840-41. Nonetheless, a single instance of misconduct—with immediately preceding comments to the jury that they are the ultimate trier of fact—did not require reversal. <u>Id.</u> at 841.

By contrast, here, the State's argument did not liken violating the jurors' oath with accepting the defense theory. Pay-Pay argued in closing that the State had "not proved their case and [ ] Ford told you so when he told you that he couldn't rule out that possibility that Pay-Pay wasn't even in the car." The challenged portion of the State's rebuttal argument was a direct response to Pay-Pay's closing and warned the jury against being overly reliant on Ford's testimony. The State instead emphasized the jury's responsibility to consider the entirety of the evidence:

> It's going to be hard. There are lots of exhibits. There are lots of surveillance videos. There are PowerPoints for you to go through . . . . The things that are in this evidence, there are things that are in the testimony, the things that are in the exhibits, those prove [] Pay[-P]ay is guilty of this crime beyond a reasonable doubt. You have to be willing to do the work and not take the easy way out.

Taken in context, the State's rebuttal argument exhorting the jury to do its job was not misconduct requiring reversal.

49

V. Cumulative Error

Pay-Pay further argues that there was cumulative error. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." Emery, 174 Wn.2d at 766. As discussed above, we concluded that only the admission of the bingo card was error. Because we concluded that error was harmless, we further conclude the single harmless error did not create a cumulative negative effect requiring reversal.

VI. Denial of Motion to Continue Sentencing

Pay-Pay argues that the trial court erred by denying his motion to continue sentencing for the purpose of procuring a neuropsychological evaluation from an expert witness, thereby preventing him from presenting "critical mitigation evidence." We disagree.

After trial concluded, on May 5, 2023, the trial court set the sentencing date for June 9, 2023. Defense counsel did not object to the sentencing date. Rather, it stated, "[W]e'll do our best to get all the mitigating materials together in short order. There's a lot to do given Mr. Pay-Pay's age at the time," to which the court replied, "I understand."

Subsequently, on June 1—eight days before the sentencing hearing—Pay-Pay moved to continue sentencing to mid-August so that his expert could conduct a neuropsychological evaluation. Pay-Pay asserted that the expert could not complete the evaluation earlier because they were on vacation. On June 2, the court denied the motion. Thereafter, on June 5, Pay-Pay filed a nine-page presentencing memorandum detailing his family dysfunction, trauma, personal losses, shootings that he had

witnessed, and school history, and attached a "White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers." Sentencing proceeded as scheduled on June 9.

On appeal, Pay-Pay argues that the trial court relied on untenable reasons in denying the motion because the court articulated no basis for denying the motion other than that she was retiring from the bench soon and could hear the mitigation evidence from defense counsel, rather than the expert who would "filter[] it after their vacation."[25] Trial courts have "broad discretion to make a variety of trial management decisions." State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013). "A decision is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." State v. Hampton, 184 Wn.2d 656, 670, 361 P.3d 734 (2015) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)). And a decision is manifestly unreasonable only "if the court, despite applying the correct legal standard to the supported facts, adopts a view 'that no reasonable person would take,' " Rohrich, 149 Wn.2d at 654 (quoting State v. Lewis, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990)), and "arrives at a decision 'outside the range of acceptable choices.' " Rohrich, 149 Wn.2d at 654 (quoting State v. Rundquist, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

Pay-Pay suggests that the court abused its discretion because expert testimony was a necessary component of mitigation evidence. However, the cases on which he relies do not support this contention. Instead, while a sentencing court must consider

---

[25] The court did not state these as reasons for denying the continuance, and its order denying the continuance offered no specific reasons for the denial. Rather, the court made the statements about which Pay-Pay complains at the sentencing hearing.

the mitigating qualities of youth in sentencing juveniles and young adults aged 19 and 20 who are subject to mandatory life without parole (LWOP), even in those cases, expert testimony is not always required. See State v. O'Dell, 183 Wn.2d 680, 697, 358 P.3d 359 (2015) ("[A] defendant need not present expert testimony to establish that youth diminished [their] capacities for purposes of sentencing."); State v. Alltus, 10 Wn. App. 2d 193, 201-03, 447 P.3d 572 (2019) (no discussion of need for expert testimony in case involving sentencing of juvenile); In re Pers. Restraint of Monschke, 197 Wn.2d 305, 329, 482 P.3d 276 (2021) (no discussion of need for expert testimony in case requiring consideration of youth for young adults aged 19 and 20 subject to mandatory LWOP). At most, the Supreme Court has stated that "the court must 'receive and consider relevant mitigation evidence . . . including both expert and lay testimony *as appropriate*." State v. Delbosque, 195 Wn.2d 106, 121, 456 P.3d 806 (2020) (emphasis added) (quoting State v. Ramos, 187 Wn.2d 420, 443, 387 P.3d 650 (2017)); see also In re Pers. Restraint of Frazier, 4 Wn.3d 1, 25-26, 558 P.3d 451 (2024) ("*[I]n some cases*, expert testimony may be needed to draw a direct connection between the petitioner's specific offense and novel scientific theories about general patterns of adolescent neurodevelopment.") (emphasis added).

The primary case on which Pay-Pay relies, Alltus, is inapposite. 10 Wn. App. 2d 193. Alltus involved a 16-year-old juvenile offender, not a young adult offender like Pay-Pay. Id. at 194. The sentencing hearing in Alltus was scheduled for 10:00 a.m. the day after the jury had returned its verdict the previous evening at 9:23 p.m. Id. at 198-99. The following day, before the sentencing hearing, Alltus "filed a motion asking the court to continue the sentencing hearing and order a presentence report," arguing the court

could not otherwise make an informed decision without understanding her "difficult family background," "traumas," and "mental health history." Id. at 199. Division Three of this court held the court abused its discretion by denying the continuance because the defense could not meaningfully compile the mitigatory information about youth in time. Id. at 203.

By contrast, here, sentencing was scheduled, without any initial objection, for a date over a month after trial. Pay-Pay was able to prepare and present mitigating evidence and filed a presentence report. This is a far cry from the situation in Alltus, where the defendant had barely 12 hours after the verdict to gather and present mitigating evidence. And, as discussed below, here, the trial court did adequately consider Pay-Pay's youth. Accordingly, even if standing alone, the court's statement about her impending retirement would have been an insufficient basis upon which to deny the continuance, here, other bases support the denial. State v. Torres, 151 Wn. App. 378, 389, 212 P.3d 573 (2009) ("We may affirm on any basis supported by the record."). Pay-Pay was able to present mitigating evidence at sentencing, and we conclude the trial court did not abuse its discretion in denying Pay-Pay's motion.

VII. Consideration of Youth at Sentencing

Pay-Pay next argues that the trial court violated his "constitutional rights when it failed to meaningfully consider his youth at sentencing." We disagree.

Under RCW 9.94A.540(1)(a), adults convicted of murder in the first degree are subject to a mandatory minimum sentence of not less than twenty years. The standard range for murder in the first degree for a defendant with Pay-Pay's offender score of 5 was 291-388 months; including a mandatory 60 months for a firearm enhancement, the

range was 351-448 months. The State recommended a total sentence of 360 months, near the low end of the standard range. Pay-Pay requested an exceptional downward departure from the sentencing guidelines based on his youth at the time of the offense, age 19, along with trauma suffered as a young adult, as mitigating circumstances. The trial court sentenced Pay-Pay to a term of total confinement of 300 months, or 25 years, before application of the mandatory firearm enhancement.

The State argues that because Pay-Pay received a standard range sentence and there was no procedural error, he cannot appeal his sentence. The State is correct that generally, the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, prohibits appeal of a standard range sentence. RCW 9.94A.585(1). However, "even RCW 9.94A.585(1) 'does not bar a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision.' " Delbosque, 195 Wn.2d at 126 (quoting State v. Williams, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003)). Indeed, "appellate review is still available for the correction of legal errors or abuses of discretion in the determination of what sentence applies." Williams, 149 Wn.2d at 147. Pay-Pay argues that even though he requested an exceptional sentence, the trial court failed to meaningfully consider his youth at sentencing. A trial court errs when a defendant requests an exceptional sentence and it refuses to meaningfully consider youth as a possible mitigating factor. O'Dell, 183 Wn.2d at 696. Here, Pay-Pay may challenge whether the trial court meaningfully considered his youth as a mitigating factor.

Next, we address Pay-Pay's request that this court "clarify that the trial court is not bound by the mandatory minimum under RCW 9.94A.540 at []sentencing," which

requires "a term of total confinement not less than twenty years." Generally, when sentencing juvenile or youthful offenders, trial courts have discretion to depart from the standard range under the SRA to consider one of the mitigating factors in RCW 9.94A.535(1): "whether youth diminished [a defendant's] capacity to appreciate the wrongfulness of [their] conduct or conform that conduct to the requirements of the law." O'Dell, 183 Wn.2d at 696. Further, while "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence," id. at 695, a "defendant's youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant, and . . . the sentencing court must exercise its discretion to decide when that is." Id. at 696. To warrant an exceptional sentence, a youthful offender must show the crime reflects "youthful immaturity, impetuosity, or failure to appreciate risks or consequences." State v. Anderson, 200 Wn.2d 266, 284, 516 P.3d 1213 (2022).

But Pay-Pay provides no controlling authority stating that for offenders of his age, 19, a sentencing court has discretion to depart below a mandatory minimum sentence under the SRA based on a consideration of youthfulness. State v. Houston-Sconiers applies exclusively to juveniles. 188 Wn.2d 1, 34, 391 P.3d 409 (2017).[26] RCW 9.94A.540(3)(a) expressly exempts juveniles tried as adults from the statute's

---

[26] Our courts have similarly limited the court's discretion to deviate downward with regard to mandatory sentencing enhancements. In State v. Brown, 139 Wn.2d 20, 29, 983 P.3d 608 (1999), the Washington Supreme Court held that courts do not have discretion to deviate downward from the minimum sentence for a mandatory enhancement (in that case, a deadly weapons enhancement). Our Supreme Court recently reaffirmed that sentences for firearm enhancements " '*shall run consecutively* to all other sentencing provisions.' " State v. Kelly, 4 Wn.3d 170, 192, 561 P.3d 246 (2024) (quoting RCW 9.94A.533(3)(e)). Houston-Sconiers overruled Brown "only as it applies to juveniles." State v. Mandefero, 14 Wn. App. 2d 825, 831, 473 P.3d 1239 (2020).

mandatory minimums for adults.[27] And Monschke is limited to its specific context, mandatory LWOP for an aggravated murder conviction for youthful offenders aged 18 to 20. See 197 Wn.2d at 329.[28] In Monschke, the lack of discretion to consider youth under the aggravated murder statute, RCW 10.95.030, "was a key factor in the lead opinion's analysis, which reasoned that RCW 10.95.030 was unconstitutional as applied." In re Pers. Restraint of Davis, 200 Wn.2d 75, 83, 514 P.3d 653 (2022) (determining Monschke was not material to a defendant convicted of crimes committed at age 21 that did not require a life sentence). Pay-Pay is neither a juvenile offender nor a youthful offender aged 18-20 convicted of aggravated murder subject to a life sentence.

Thus, the sentencing court did not have discretion to depart downward from the mandatory minimum under RCW 9.94A.540(1)(a). But it did have discretion to consider youthfulness in determining what sentence to impose within the standard range down to, though not below, the mandatory minimum.

Further, the record demonstrates that the sentencing court exercised this discretion to consider youthfulness as a mitigating factor. Pay-Pay requested an exceptional downward departure from the sentencing guidelines given his "young age at

---

[27] Neither party addresses the significance of the reasoning in O'Dell that justified its determination that the trial court must be able to consider a departure from the standard sentence range. The court applied a two-part test: (1) first, a factor cannot support the imposition of an exceptional sentence if the legislature *necessarily* considered that factor when it established the standard sentence range and (2) in order to justify an exceptional sentence, a factor must be sufficiently substantial and compelling to distinguish the crime in question from others in the same category. The court "decline[d] to hold that the legislature necessarily considered the relationship between age and culpability when it made the SRA applicable to all defendants 18 and older." 183 Wn.2d at 693.

[28] See, e.g., In re Pers. Restraint of Kennedy, 200 Wn.2d 1, 23 n.5, 513 P.3d 769 (2022) ("To the extent Kennedy suggests that Monschke announced a broad principle requiring the consideration of youth at all sentences received by young adults under the [SRA], he identifies no reasoning in Monschke that extends its holding beyond the context of mandatory LWOP sentences or any reasoning that extends Houston-Sconiers's holding.").

the time he was found to have committed these crimes, along with the trauma he suffered as a young adult." In his presentencing memo, he recounted a dysfunctional home life and a continual exposure to violence—particularly gun violence—within his personal life and immediate community. Indeed, during his childhood and early adulthood, Pay-Pay saw and experienced approximately 14 to 15 shootings and personal losses.

Pay-Pay argues that because the court did not look at how he "may have been impacted by familial and peer pressures or 'factors suggesting [he] might be successfully rehabilitated,' " this oversight qualifies as failing to meaningfully consider youthfulness as a mitigating factor, citing Houston-Sconiers. But the court did consider these factors. Indeed, "a trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion." State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).

At the sentencing hearing, the trial court acknowledged the social history Pay-Pay recounted in his presentencing report, stating that it had read the report "very closely," and noting that it retained discretion in determining whether Pay-Pay's sentence should be within the standard range:

> Mr. Pay-Pay has a terrible background, a truly terrible background. I'm not going to share it with you, but I will tell you that it's horrendous, and nobody should have to be raised like that. And I think it's bound to leave you with damage and insensitivity to violence, a lack of appreciation of how deeply damaged you are.
> . . . .
> [C]ourts don't do sentencing without thinking about youth. We're not supposed to, and I don't think we should. Not everybody fails to mature until age 25, but it's true that a lot of people don't.
>
> So the courts have to think about brain development, and we have to think about backgrounds like Mr. Pay-Pay's that are really traumatic,

and we have to think about how that measures up against what we see before us, and the factors I am required to consider for sentencing. It's not optional . . . .

Additionally, the court noted some of the factors it could consider when determining whether youth diminished Pay-Pay's capacity to appreciate the wrongfulness of his conduct or conform that conduct to the requirements of the law:

I need to ask myself if Mr. Pay-Pay's immaturity, because, you know, he was well under 25. He was about 19, 20 when this happened. Whether his impetuosity or whether his failure to appreciate risks and consequences contributed to the commission of the crime in any way that makes him less culpable than others who commit crimes with firearms.

And I need to look to see if the circumstances of the crime show that his youth diminished his capacity to appreciate the wrongfulness of his conduct or conform it to the requirements of the law.

The court then proceeded to consider Pay-Pay's history in the context of the case:

Now, that's a subtle analysis for Mr. Pay-Pay because one part of this crime is completely juvenile, and that is the rage at GGG and at Mr. Richardson as a member of GGG. The rage at this music video, because of what Mr. Richardson did on top of the Holly Park basketball net. That part is completely adolescent and juvenile. There's just no question about it. It's just such an arrested development sort of way to develop a motive for murder.

You know, grownups don't kill each other over what soccer uniform they wear or what group they affiliate with. That is a real sign of immaturity. And that is the one and only thing I see in this case that looks immature. The rest of it looks like Mr. Pay-Pay's cool, calculating and intelligent brain in action. He knew why he was going to this neighborhood to pick up Mr. Mohammed in his car. He knew what Mr. Mohammed had in his possession. He knew Mr. Mohammed had a gun. He knew that Mr. Sharif had a gun. We'll never know who gave Mr. Sharif that gun, but Mr. Pay-Pay sure knew. Mr. Pay-Pay knew that the reason to be there was because Mr. Richardson had been spotted going and getting the food that he then went to deliver.

And Mr. Pay-Pay was lying in wait for Mr. Richardson to leave from the drop off of that food, and then he followed him, and he is solely

58

responsible for that. He was the driver in his own car. His cool, calculating brain got him onto the highway just in time to speed up so that his shooters could have a good view of Mr. Richardson's car and fire.

. . . .

And then there's the very calculated behavior afterwards of driving to a fairly distant car wash and promptly and carefully washing the side of the car where the gunshot residue would be, and then promptly and carefully getting rid of the car, and then very intelligently and thoughtfully lying to the police about the date the car was sold. All of this is the un-youthful side of Mr. Pay-Pay and the side that makes me sad. Because all that smarts, all that intelligence that should have gone to something different.

After weighing the information provided, the trial court determined the mitigating evidence was insufficient to justify a sentence below the standard range:

So this is a case where I see some signs of mitigation. Certainly, Mr. Pay-Pay's traumatic background is a mitigator for me, and certainly the immaturity of his motivation here is a mitigator for me, but it doesn't mitigate me very far. It mitigates me down to what the State is recommending here, which is a long sentence, a 30-year sentence.

Thus, the record shows the trial court did recognize and consider Pay-Pay's youthfulness and traumatic upbringing in imposing a sentence. The mere fact that the trial court declined the request for a downward departure from the mandatory minimum does not necessarily mean the information presented was not meaningfully considered. Moreover, Pay-Pay did not identify what additional evidence relating to rehabilitation the expert would have provided that he could not obtain otherwise before the sentencing. Accordingly, the trial court did not fail to exercise its discretion to consider youth as a mitigating factor, as it acknowledged and analyzed the effect of Pay-Pay's youthfulness on his crime.

VII. Reliance on Unproven Facts at Sentencing

Pay-Pay argues that the trial court relied upon facts that had no basis in the record when sentencing Pay-Pay, violating RCW 9.94A.530(2) and his constitutional right to due process.[29] We disagree.

"Constitutional and statutory procedures protect defendants from being sentenced on the basis of untested facts." State v. Grayson, 154 Wn.2d 333, 338, 111 P.3d 1183 (2005). An unpreserved sentencing error "may be raised for the first time on appeal because sentencing can implicate fundamental principles of due process if the sentence is based on information that is false, lacks a minimum indicia of reliability, or is unsupported in the record." State v. Jones, 182 Wn.2d 1, 6, 338 P.3d 278 (2014).

"[O]utside of narrow constitutional or statutory limitations, a sentencing judge's discretion remains largely unfettered." State v. Mail, 121 Wn.2d 707, 710, 854 P.2d 1042 (1993). "[A] 'sentencing judge has very broad discretion in imposing any sentence within the statutory limits, and in exercising that discretion *[they] may and should consider matters that would not be admissible at a trial*.' " State v. Herzog, 112 Wn.2d 419, 424, 771 P.2d 739 (1989) (emphasis added) (quoting United States v. Doyle, 348 F.2d 715, 721 (2d Cir.), cert. denied, 382 U.S. 843 (1965)). However, "[b]are assertions, unsupported by evidence, do not satisfy the State's burden." State v. Hunley, 175 Wn.2d 901, 910, 287 P.3d 584 (2012) (addressing State's burden to prove prior convictions at sentencing by preponderance of evidence); see also State v. Royal, 26 Wn. App. 2d 812, 818, 530 P.3d 573 (2023) (same). The facts relied upon by the trial

---

[29] Pay-Pay argues the State's lack of response to this claim constitutes a concession of this argument. We disagree and consider the claim on the merits.

court must have some basis in the record. State v. Knippling, 166 Wn.2d 93, 102, 206 P.3d 332 (2009).

Here, Pay-Pay complains first of the court's statement that Pay-Pay had a "cool, calculated, and intelligent brain," relying on the fact that he was "thoughtful" because he was "the one and only person here who thought to turn off his phone and not give Snapchat his location." Pay-Pay contends that these assertions were not based on the record because "Mr. Pay-Pay did not take action [to] . . . preclude Snapchat geolocation; he just did not manually change the default setting to allow Snapchat to collect that data."

Pay-Pay is correct that the record does not show that Pay-Pay affirmatively prevented Snapchat from tracking his location. Rather, the evidence at trial was that collection of geolocation data was not automatically enabled; Snapchat would collect geolocation data if the user "manually, within the app," enabled the collection and sharing of location data as well as affirmatively enabling location data collection in their device, such as their phone. Nevertheless, here, the trial court's statement does not rise to the level of a due process violation. Here, while the sentencing court did reference Pay-Pay's interference in Snapchat geolocation as evidence of his intellect and premeditation, it also referenced numerous other facts from trial that led to its assessment. For example, the court said that "one part of this crime is completely juvenile, and that is the rage at GGG" and at Richardson because of what he did in the music video "on top of the Holly Park basketball net." Then, the court continued its reasoning:

> The rest of it looks like Mr. Pay-Pay's cool, calculating and intelligent brain in action. He knew why he was going to this neighborhood to pick up Mr.

61

> Mohammed in his car. He knew what Mr. Mohammed had in his possession. He knew Mr. Mohammed had a gun. He knew that Mr. Sharif had a gun. . . . Mr. Pay-Pay knew that the reason to be there was because Mr. Richardson had been spotted going and getting the food that he then went to deliver. And he was lying in wait for Mr. Richardson . . . and then he followed him. . . . His cool, calculating brain got him onto the highway just in time to speed up so that his shooters could have a good view of Mr. Richardson's car and fire.
> . . . .
> And then there's the very calculated behavior afterwards of driving to a fairly distant car wash and promptly and carefully washing the side of the car where the gunshot residue would be, and then promptly and carefully getting rid of the car, and then very intelligently and thoughtfully lying to the police about the date the car was sold.

Therefore, the record demonstrates that the Snapchat geolocation was not critical to the trial court's determination that Pay-Pay was cool, calculating, and intelligent.

Pay-Pay also complains that the court "blame[d] Mr. Pay-Pay for bringing Mr. Sharif into this" by "exploit[ing]" their friendship and manipulating Sharif. Pay-Pay also asserts that the court speculated about Pay-Pay's state of mind and that "[w]e'll never know who gave Mr. Sharif that gun, but Mr. Pay-Pay sure knew." Pay-Pay claims that because neither Mr. Sharif nor Mr. Pay-Pay testified, "there was no evidence their relationship was used to manipulate Mr. Sharif, and there was absolutely no evidence establishing that Mr. Pay-Pay knew who gave the gun to Mr. Sharif."

Even if such specific evidence is lacking, the judge's statements regarding Pay-Pay's influence over Sharif were based on inferences from the trial evidence and satisfied the due process requirement of a minimum indicia of reliability. For example, at the ER 404(b) hearing, the trial judge saw a picture of Pay-Pay and a younger Sharif with the caption "right hand mans since kids." The court stated that the picture looked "pertinent" "to the extent [it] show[ed] a strong affiliation that Mr. Pay-Pay feels with Mr. Sharif." The State also presented the trial judge with multiple pieces of evidence of Pay-

Pay and Sharif in photos together and interacting on social media, including a photo of Sharif that Pay-Pay captioned "LIL BROTHER GO CRAZY," which the trial court admitted as evidence of "[c]onnection and/or relationship between defendants." This evidence supported the trial court's statement that Pay-Pay had influence over Sharif.

Further, the court's statements about what Pay-Pay "knew" were all based on reasonable inferences from the trial evidence. The geolocation evidence supported the State's theory that Pay-Pay, Mohamed, and Sharif were working together to track Richardson and follow him to where he was shot. As the conviction required proof of his intent, it was not error for the court to rely on the same evidence in making its sentencing decision. Ultimately, many facts supported by the trial record supported the court's sentencing decision other than the specific ones about which he complains. The trial court referenced videos of Pay-Pay and his friends celebrating the shooting, the depth of loss of Richardson to his friends and family, and the mitigating evidence in favor of Pay-Pay. The sentencing court properly relied on facts in evidence and others presented during the proceedings, including at sentencing, that had the minimum indicia of reliability. Accordingly, we reject Pay-Pay's claim that the court violated his constitutional right to due process on this basis.

IX.  Right to an Impartial Tribunal

Pay-Pay argues that he was denied his federal and state constitutional rights to be tried and sentenced by an impartial court because the court "allowed Mr. Richardson's family to berate and threaten" him and "expressed personal agreement that the statements were valid," even though the court is "responsible for maintaining decorum in the courtroom" and should refrain from "expressing personal prejudice" and

from letting others do so. We conclude the court did not violate Pay-Pay's right to a fair trial.

Fair trial claims fall into two categories: due process, which is a constitutional requirement and establishes the minimal requirements for a fair hearing, and claims under the "appearance of fairness doctrine," which provides greater protection. State v. Blizzard, 195 Wn. App. 717, 725, 381 P.3d 1241 (2016). We agree with the State that because appearance of fairness claims are not constitutional and Pay-Pay did not raise this claim before the trial court, he has waived the argument on appeal. However, denial of the constitutional right to a fair tribunal is a structural error, so Pay-Pay may raise this constitutional claim for the first time on appeal. See id. at 727 (citing RAP 2.5(a)(3)).

"At a minimum, due process 'requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of [their] particular case.' " In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004) (internal quotation marks omitted) (quoting Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (citations omitted)). To determine whether due process rights have been violated, we undertake an objective analysis that asks " 'not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in [the same] position is likely to be neutral or whether there is an unconstitutional potential for bias.' " Blizzard, 195 Wn. App. at 727 (quoting Williams v. Pennsylvania, 579 U.S. 1, 8 (2016) (internal quotation marks omitted) (quoting Caperton v. A.T. Massey Coal, 556 U.S. 868, 881 (2009))). The record must have " 'an appearance of impartiality, such that a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing.' " State v. Mandefero, 14 Wn. App. 2d 825, 835,

473 P.3d 1239 (2020) (quoting State v. Ra, 144 Wn. App. 688, 705, 175 P.3d 609 (2008)). "There is a presumption that the trial court properly acted without bias or prejudice, and the party seeking to overcome that presumption must provide specific evidence establishing actual or potential bias." Mandefero, 14 Wn. App. 2d at 835.

In Blizzard, the court identified three "established categories," 195 Wn. App. at 728, of "unconstitutional judicial bias": "(1) when a judge has a financial interest in the outcome of a case, (2) when a judge previously participated in a case in an investigative or prosecutorial capacity, and (3) when an individual with a stake in a case had a significant and disproportionate role in placing a judge on the case through the campaign process." Id. at 727-28 (citing Caperton, 556 U.S. at 881).

The State argues that because none of these three categories applies here, Pay-Pay's claim fails. But these categories are not the exclusive ways to establish unconstitutional judicial bias. See, e.g., Davis, 152 Wn.2d at 692-93 (rejecting claim of bias where there was no evidence "that the trial judge had a personal interest in the outcome of the . . . hearing or was otherwise personally prejudiced" against the defendant); Blizzard, 195 Wn. App. at 728 (citing Ungar v. Sarafite, 376 U.S. 575, 583 (1964)) (noting that the U.S. Supreme Court has suggested "there may be an impermissible risk of bias when a judge is the recipient of personal criticisms that are highly offensive").

"Epithets and slurs" toward litigants can manifest bias or prejudice. State v. Lemke, 7 Wn. App. 2d 23, 27, 434 P.3d 551 (2018) (citing CJC 2.3 cmt. 2). For example, in Lemke, the judge's calling litigant a "fucking addict" and "just a criminal" was a "manifestation of personal animosity" that deprived defendant of a due process.

Id. at 28. In Ra, the court stated there was an "appearance of partiality" and it was "inappropriate" and did not show proper restraint for the judge to suggest that defendant was "some distorted character who breeds and lives violently," to scold him for nodding as if he agreed with the court, and to propose theories for State. 144 Wn. App. at 705 (court did not consider whether appearance of partiality alone required reversal because it reversed for wrongly admitted gang evidence). However, " '[i]t is not evidence of actual or potential bias for a judge to point out to a defendant the harm caused to a victim by his or her criminal conduct.' " Mandefero, 14 Wn. App. 2d at 836 (quoting State v. Worl, 91 Wn. App. 88, 97, 955 P.2d 814 (1998)). For example, in Worl, the judge's reference to his family's personal experiences with harassment and intimidation based on race was not evidence of actual or potential bias. 91 Wn. App. at 96. Although the statements "may be understood to reflect a personal experience" and a trial judge should exercise care in such circumstances, the remarks conveyed to Worl "the judge's understanding of the harmful impact of Mr. Worl's criminal conduct on the victim," and "in context served a proper sentencing purpose," i.e., "the intended deterrent impact of the punitive aspects of the sentence." Id. at 96-97.

Here, Pay-Pay complains the trial court was biased because it made statements describing Pay-Pay's conduct as "evil" and "heinous" and "behavior I can only describe as horrendous." The court also described Pay-Pay as "thinking of [Richardson] as an enemy and a member of a rival group and [having] a lot of hatred in his heart." Further, he challenges the court's characterization of Pay-Pay as "cool" and "calculating" and, along with Mohammed, "the most responsible here." The court "blame[d]" Pay-Pay for "bringing Mr. Sharif into this" and described him as someone who "exploited" a

friendship with Sharif, who was younger and loyal to Pay-Pay. The court compared Pay-Pay, who "reveled in . . . the world of guns," to Richardson, who was "extraordinarily talented" and "a really obviously very sweet, kind, and loving person who left [friends and family] all totally bereft."

But unlike the statements in Lemke and Ra, here, the court's statements were not epithets, nor did they evidence personal animosity. The court merely summarized evidence from the trial about Pay-Pay's behavior and motivation and the relationship dynamics that resulted in the murder. In addition to the complained-of statements, the court also recognized Pay-Pay's background was "really traumatic" and that he had "ruined his own life too." The court acknowledged Pay-Pay's "leadership ability" and "smarts" and that "he would have had a future as a businessman."

Nor does the court's apparent concern for Richardson's family suggest bias. Many of the court's statements to which Pay-Pay points as evidence of bias against him merely acknowledged the rights of the victim's family and friends to be heard and were made in the context of its efforts to control the courtroom. At one point during the sentencing, the court referenced something "going on out there" "in the hall" and subsequently requested, "If people want to attend the sentencing, please come back and be seated." Specifically addressing Richardson's family and friends, the court acknowledged their patience throughout the case and stated it wanted them "to be able to have that chance to participate in this process," but that they couldn't do so "if everybody's out talking to each other in the hallway." The court took a short recess to "g[e]t things under control." When it returned to the bench, after acknowledging people's emotions and requesting them "to try to be patient a little bit longer," the court explained

67

that officers had removed Pay-Pay from the courtroom "because it wasn't safe, and it's their responsibility, whether they love it or not, to make sure it's safe," but "[i]f we can say it's calm in here, they will bring him back and we can finish sentencing." The court then recessed again so that Pay-Pay could return to the courtroom.

When the court reconvened, Richardson's mother[30] said, "I'm sorry, Your Honor," to which the court responded, "Don't be sorry," that it understood she was upset and needed time to talk, but "wanted to get you back" in court because she was "the most important person here." Telling the victim's mother she was the "most important person" to be present during sentencing does not evidence bias by the court.[31]

Moreover, trial courts have broad discretion to make trial management decisions; even if we disagree, we will not reverse a decision unless it is manifestly unreasonable or based on untenable grounds or untenable reasons. See State v. Dye, 178 Wn.2d 541, 547-48, 309 P.3d 1192 (2013). Here, Pay-Pay complains of the court's inaction regarding threats against him during sentencing—specifically, when Richardson's mother said to him, "I hope they put that Kool-Aid on you to make you . . . [t]heir bitch. . . . I'll be waiting for your bitch ass," and "justice will be served. . . [w]hether it's in the courts or in the streets or in jail." Pay-Pay complains that the court did nothing when he asked "the Court to caution everyone to please not threaten Mr. Pay-Pay or in any way address him directly as it is inappropriate courtroom decorum." Richardson's mother continued, "I'm not threatening him. I'm just saying that justice will be served,"

---

[30] Pay-Pay describes the speaker as Richardson's mother. The verbatim report of proceedings labels the person as an "unidentified speaker."

[31] Also, when Richardson's mother suggested her son was killed because she was fighting cancer and stayed in town until she made it through surgery, the court made supportive statements such as "[i]t's not your fault that you were sick" and "[t]hat he was loving does not mean—that's not the reason that this happened." These statements expressing compassion also do not exhibit bias by the court against Pay-Pay.

"[w]hether it's in the courts or in the streets or in the jail," and the trial court twice interjected, "I hear you." The court's determination not to take the action Pay-Pay requested at this point was not manifestly unreasonable. Moreover, the court did take steps to protect Pay-Pay. As discussed above, the court took recesses and specifically addressed Richardson's friends and family to be patient and calm. And when Richardson's family interrupted Pay-Pay's counsel, the court told them to "stop" and to let counsel speak because "[e]verybody gets to speak, okay?"

Finally, the record demonstrates that the court did not abuse its discretion in balancing the rights of Richardson's family and friends to participate in the sentencing and maintaining the decorum of the proceeding. For example, the court acknowledged the justice system was imperfect but it didn't "want to see anybody here involved in an ongoing cycle of violence." Further, because the court "worr[ied] for your safety," it had "reached out to make sure that people who felt threatened were heard" and "that offer is still out there for anybody that felt threatened today or assaulted today to make a report and be heard"; however, the court also stated it wished for them to "be able to move on with your lives and not keep engaging in hatred with each other." Further, the court stated that the reason it proceeded through the sentencing hearing, despite the disruptions, "is that I wanted everybody to see the end of this process because I know you've waited so long for it, and I think Mr. Richardson and all of you deserve that. I think Mr. Pay-Pay deserves that." And the court said it was time "for there to be a reckoning that's also lawful." The court's comments taken in context merely described the legal process Richardson's family and friends and the defendants had experienced and its hopes for minimizing ongoing violence. The court ultimately sentenced Pay-Pay

below the maximum, despite Richardson's mother requesting the maximum, due to Pay-Pay's "traumatic background" and the "immaturity of his motivation" as mitigators.

In sum, as the party seeking to overcome the presumption that the trial court properly acted without bias or prejudice, Pay-Pay does not meet his burden of providing specific evidence establishing actual or potential bias. The record does not demonstrate unconstitutional bias against Pay-Pay in violation of his due process right to a fair trial.

X. Sentencing Issues

Pay-Pay challenges the inclusion of juvenile adjudications, which contributed four of five points to his offender score. First, he argues that this was error based on legislative amendments to RCW 9.94A.525 that prohibit most juvenile adjudications from being included in an offender score. See Laws of 2023, ch. 415, § 2. Though the law took effect on July 23, 2023, after Pay-Pay's June 9, 2023 sentencing hearing, he claims it applies to him. We disagree.

This court has held that "the plain language is unambiguous and does not evince a legislative intent for [the statute] to apply retroactively," and, therefore, "under the SRA, RCW 9.94A.345, and the saving clause, RCW 10.01.040, the law in effect at the time of the offense applies." State v. Troutman, 30 Wn. App. 2d 592, 597-600, 546 P.3d 458, review denied, 3 Wn.3d 1016 (2024). See also State v. Tester, 30 Wn. App. 2d 650, 659, 546 P.3d 94, review denied, 3 Wn.2d 1019 (2024). We decline the invitation to depart from our precedent and hold that the legislative amendments to RCW 9.94A.525(1)(b) do not apply to Pay Pay's offender score calculation.

Alternatively, Pay-Pay argues that he was "entitled to a jury determination on whether the two juvenile offenses used to increase his offender score constituted the 'same course of conduct.' " This claim is also unavailing.

First, a defendant who has agreed at sentencing that their offender score was properly calculated cannot raise for the first time on appeal a claim that their prior convictions constituted the same criminal conduct. In re Pers. Restraint of Shale, 160 Wn.2d 489, 494-95, 158 P.3d 588 (2007) (plurality opinion), overruled on other grounds by State v. Knight, 162 Wn.2d 806, 174 P.3d 1167 (2008). Here, Pay-Pay did not dispute that he had two prior juvenile adjudications.[32] Moreover, he did not contest the offender score calculation and never asked the trial court to find that they constituted the same criminal conduct.

Pay-Pay's claim fails on the merits as well. Pay-Pay contends that "[u]nder the Sixth and Fourteenth Amendments, any fact that increases punishment must be found by the jury beyond a reasonable doubt," and the only "narrow exception" to this rule is that judges may find "the fact of a prior conviction," citing Erlinger v. United States, 602 U.S. 821, 839 (2024). Therefore, he contends, only a jury, not the sentencing court, could determine whether the offenses constituted the same course of conduct.

In Erlinger, the Court held that under the federal Armed Career Criminal Act (ACCA), 18 U.S.C. § 922(e)(1), a jury, not the court, had to make the factual determination that Erlinger's offenses occurred on at least three different occasions for an enhanced sentence to apply. Erlinger, 602 U.S. at 835. This case involves Washington's SRA, not the ACCA, and this court has expressly declined to extend

---

[32] Pay-Pay's counsel stated, "The record is clear that Mr. Pay-Pay has two juvenile convictions prior to this charge."

Erlinger to the SRA. State v. Frieday, 33 Wn. App. 2d 719, 747, 565 P.3d 139, review denied, 5 Wn.3d 1006 (2025), cert. denied, --- U.S. ---, 146 S. Ct. 1609 (2026) ("Erlinger should be limited to the ACCA and . . . did 'no more' than impose a requirement that a jury resolve the ACCA's occasions inquiry.") (quoting Erlinger, 602 U.S. at 835). We reject Pay-Pay's claim that only a jury could make the determination that the two juvenile offenses were not the "same criminal conduct" under the SRA and decline to remand on this issue.

Finally, the State agrees with Pay-Pay that the VPA should be stricken because he is indigent and the amended statute bars courts from imposing such fees on indigent defendants.

CONCLUSION

We remand to the trial court to strike the VPA from Pay-Pay's sentence. Otherwise, we affirm the judgment and sentence.

_Chung, J._

WE CONCUR:

_Díaz, J._                           _Smith, J._